# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **ALONZO AUSTIN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:07-cv-754-MHT** |
| | ) | |
| **CITY OF TUSKEGEE,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION TO AMEND THEIR MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

COME NOW the Defendants, by and through counsel, and respectfully move this Honorable Court to allow them to amend their Motion for Summary Judgment, and state the following:

1.      These Defendants inadvertently failed to include a copy of Exhibit 5 (Plaintiff's Deposition transcript) referred to in their Supplement when it was filed with the Court.  A copy is included herewith.

2.      At his deposition, pursuant to Rule 30(e) of the *Federal Rules of Civil Procedure*, Plaintiff Austin requested to review the transcript and submit a signed statement listing the corrections thereto.  To ensure that the record of the Plaintiff's transcript is complete, a signed copy of Plaintiff Austin's corrections and the reasons given therefor is attached herewith to Exhibit 5.

3.     This amendment will not unfairly prejudice the Defendant and is merely for the purpose of correcting a clerical error.

WHEREFORE, on the grounds set forth above, these Defendants respectfully pray this Honorable Court permit their Motion for Summary Judgment be amended as set out herein.

/s/S. Mark Dukes
S. MARK DUKES (ASB-9697-U77S)
Counsel for Defendants City of Tuskegee,
Mayor Johnny Ford, Judge Albert C. Bulls,
III, Chief Lester Patrick, Honorable R.
Keith Thomas, and Officer Bernice Dawson

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, Alabama 36103-4128
334-215-8585
334-215-7101 - Facsimile
mdukes@nixholtsford.com

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that an exact copy of the foregoing instrument has been served by Certified Mail, Return Receipt Requested to

Mr. Alonzo Austin
1321 Oliver-Carlis Road
Tuskegee, AL 36083

on this the 14th day of May, 2008.

                                   /s/S. Mark Dukes
                                   OF COUNSEL

# DEPOSITION OF ALONZO AUSTIN

## March 28, 2008

## Pages 1 through 132

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

DEFENDANT'S
EXHIBIT
5



Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5    ALONZO AUSTIN,
6         Plaintiff,
7    Vs.                CIVIL ACTION NO.
                        3:07-cv-754-MHT
8    CITY OF TUSKEGEE, et al.,
9         Defendants.
10
11
            * * * * * * * * * * * * *
12
13
14       DEPOSITION OF ALONZO AUSTIN, taken pursuant
15   to stipulation and agreement before Lisa J. Green,
16   CCR, ACCR # 334, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in the
18   Law Offices of Nix, Holtsford, Gilliland, Higgins &
19   Hitson, Suite 300, 4001 Carmichael Road, Montgomery,
20   Alabama on Friday, March 28, 2008, commencing at
21   approximately 9:10 a.m.
22
23       * * * * * * * * * * * * *

Page 2

1              APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Mr. Alonzo Austin (pro se)
     1321 Oliver-Carlis Road
5    Tuskegee, AL  36083
6
     FOR THE DEFENDANT:
7
     Mr. S. Mark Dukes
8    NIX, HOLTSFORD, GILLILAND,
        HIGGINS & HITSON
9    Attorneys at Law
     Suite 300
10   4001 Carmichael Road
     Montgomery, AL  36106
11
12
13       * * * * * * * * * * * * *
14
15           EXAMINATION INDEX
16
     ALONZO AUSTIN
17      BY MR. DUKES . . . . . . . . . . . . .  4
18
19
20   (No exhibits were marked to this deposition.)
21
22
23

Page 3

1               STIPULATION
2       It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of ALONZO AUSTIN is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Green,
7    Registered Professional Reporter and Commissioner for
8    the State of Alabama at Large, without the formality
9    of a commission, that objections to questions other
10   than objections as to the form of the question need
11   not be made at this time but may be reserved for a
12   ruling at such time as the said deposition may be
13   offered in evidence or used for any other purpose by
14   either party provided for by the Statute.
15      It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived
18   and may be introduced at the trial of this case or
19   used in any other manner by either party hereto
20   provided for by the Statute regardless of the waiving
21   of the filing of the same.
22      It is further stipulated and agreed by and
23   between the parties hereto and the witness that the

Page 4

1    signature of the witness to this deposition is hereby
2    not waived.
3
4        * * * * * * * * * * * * *
5
6              ALONZO AUSTIN
7       The witness, after having first been duly
8    sworn to speak the truth, the whole truth and nothing
9    but the truth testified as follows:
10             EXAMINATION
11   BY MR. DUKES:
12   Q.  Would you tell me your full name, please, sir,
13       and the correct spelling for the record.
14   A.  Yes, sir.  Alonzo Austin.  Alonzo,
15       A-L-O-N-Z-O, Austin, A-U-S-T-I-N.  No middle
16       name.
17   Q.  Mr. Austin, have you ever given a deposition
18       before?
19   A.  I have not.
20   Q.  All your prior litigation, you've never given
21       a deposition?
22   A.  I have not.
23   Q.  Let me tell you a little bit here about

Page 5

1    something we need to discuss up front. You
2    have the option of proceeding under what's
3    called usual stipulations. That basically
4    says that any objections are waived except for
5    the form of the question and any of those
6    relating to privilege, and those objections
7    can be made at a later time with the court,
8    and you would waive reading and signing your
9    deposition before it's filed.
10       If you do not agree to that, then you
11   will be forwarded a copy of the deposition
12   transcript. You'll get 30 days in which to
13   review it and make any changes to clerical
14   mistakes, misspellings, and things like that,
15   and then sign it and return it. Which way
16   would you prefer to go on that?
17   A.   The second one.
18   Q.   Okay, sir. Mr. Austin, have you used any
19       other names, nicknames, street names, family
20       names that people would refer to you by?
21   A.   No, I have not, other than Al. Big Al.
22   Q.   Okay.
23   A.   Short for Alonzo.

Page 6

1    Q.   Where were you born?
2    A.   Hardaway, H-A-R-D-A-W-A-Y, Alabama. I believe
3        that Zip is 36039.
4    Q.   That's in Macon County?
5    A.   Yes, sir.
6    Q.   What's your date of birth?
7    A.   4-3-46.
8    Q.   Where were you raised?
9    A.   In Hardaway.
10   Q.   What's your social security number?
11   A.   ████████. Actually, let me clarify. I
12       think I may want to amend that and have that
13       just 0358 as opposed to the first five numbers
14       if that's okay. I was told that I probably
15       need to do that, not be so free with it.
16   Q.   Were you given any specific advice on what
17       information to divulge or not to divulge at
18       this deposition by anyone?
19   A.   No, other than myself.
20   Q.   Have you consulted anyone for legal advice as
21       to how you should proceed with this
22       deposition?
23   A.   No one other than myself and the rules.

Page 7

1    Q.   Do you have a driver's license?
2    A.   I do, sir.
3    Q.   And what state was that issued by?
4    A.   Alabama.
5    Q.   What is the number?
6    A.   4575542.
7    Q.   Are there any restrictions on that license?
8    A.   Not that I know of.
9    Q.   You don't have to wear glasses or anything to
10       drive?
11   A.   My wife thinks I should, but no.
12   Q.   Have you ever had a license issued by any
13       other state?
14   A.   I have.
15   Q.   What state was that?
16   A.   California.
17   Q.   When did you have a California license?
18   A.   It was during the time I lived out there. I
19       resided in California after I got out of the
20       Marine Corps in 1968, on January the 12th,
21       through June the 9th, 1975.
22   Q.   What is your current residence address?
23   A.   1321 Oliver, O-L-I-V-E-R, then there's a

Page 8

1    hyphen, C-A-R-L-I-S, Road, Tuskegee.
2       Do you want me to spell that for you?
3    Q.   No, sir.
4    A.   Alabama. The Zip, 36083.
5    Q.   How long have you lived at that address,
6       Mr. Austin?
7    A.   Oh, goodness, since about -- we started
8       building in '82. Permanent-ized, maybe from
9       about August of '85.
10   Q.   Where did you live before that?
11   A.   Well, I resided in Tuskegee. We had the same
12       address, but I was approximately two miles in
13       a rental house from there.
14   Q.   How long have you lived in Tuskegee? Well,
15       let me rephrase that question. How long have
16       you lived in Tuskegee now since you moved back
17       from California?
18   A.   I came back in '75. On the 11th I arrived
19       here. I lived with -- I lived in Hardaway
20       until I got married, so ... let's see. From
21       June the 9th, 1975 through October 4, 1976. I
22       had better get that right. My wife will kill
23       me.

Page 9

1     So I lived in Hardaway up until that
2   point. Then I moved in with my mother and
3   father-in-law for about five or six months and
4   then to the other homeplace that I referred to
5   prior to moving in '85.
6     Now, I can go a little slower to make
7   sure you get all that.
8   Q.  I'm fine. Thank you, Mr. Austin.
9     I gather, then, since 1976 you've lived
10  in Tuskegee?
11  A.  Yes, sir. Well, let me give you this. My
12  residence was in Tuskegee, but I did attend
13  Atlanta Area Tech for a year in '77, but I
14  only commuted up. So I don't know if you want
15  to include that anywhere in the deposition or
16  not.
17  Q.  Who lives with you at 1321 Oliver-Carlis Road?
18  A.  My wife, Yvonne, Y-V-O-N-N-E, A-U-S-T-I-N.
19  Sometimes she puts a K. for her middle name.
20  That's her maiden name, which was Kindell,
21  K-I-N-D-E-L-L.
22  Q.  Are your parents still living?
23  A.  No, sir.

Page 10

1   Q.  Tell me about your educational background,
2   please, sir.
3   A.  Well, I dropped out of high school in '63,
4   Deborah Cannon Wolfe High School in Shorter,
5   Alabama.
6   Q.  What grade did you complete?
7   A.  10th. I was in the 11th when I left high
8   school.
9   Q.  Since that time, have you gone back and
10  finished high school or gotten a GED?
11  A.  I received my GED in Astoria, Oregon at Tongue
12  Point Job Corps Center, so let me help you out
13  there. That was in '65. GED, Tongue Point.
14  Do you need that information?
15  Q.  No, sir.
16  A.  Okay.
17  Q.  Since getting your GED, have you gone on to
18  college, junior college --
19  A.  Atlanta Area Tech.
20  Q.  Hold on. Let me finish my question. It makes
21  it very hard for her to get both of us at the
22  same time.
23  A.  Okay.

Page 11

1   Q.  Since you got your GED, have you gone on and
2   attended any junior college, trade school,
3   college, any other type of formal education?
4   A.  Atlanta Area Tech in the year -- from January
5   of '77 through December. I received my
6   diploma in machine shop, tool and die.
7   Q.  Have you ever had any other training or formal
8   education?
9   A.  I had a little. I attended school in 1980
10  here, H & R Block, on the East South
11  Boulevard. I obtained a diploma there in
12  1980.
13  Q.  What was that diploma in?
14  A.  Income tax preparation.
15  Q.  Do you attend church anywhere once a month or
16  more often?
17  A.  Absolutely not.
18  Q.  Does your wife?
19  A.  My wife does. For the record, I'm an
20  agnostic.
21  Q.  Where does your wife attend church?
22  A.  Boy, you hit me with that. Let's see.
23  Pleasant, P-L-E-S-A-N-T, Pleasant Grove. I

Page 12

1   think I'm right. G-R-O-V-E.
2   Q.  Where is that?
3   A.  In Tuskegee. Tuskegee, Notasulga area. It's
4   along 81 there.
5   Q.  Okay.
6   A.  I would think it's in Tuskegee.
7   Q.  What denominational affiliation is that?
8   A.  Baptist.
9   Q.  Do you now or have you ever been a member of
10  any type of organization, such as fraternal,
11  professional, benevolent, unions, social
12  clubs, hunting clubs, Masons, Shriners,
13  anything like that?
14  A.  I was in a union in California in 1970. That
15  was -- I'm trying to think. I was a taxicab
16  driver, and I'm trying -- it was the
17  chauffeurs, but I can't give you the exact
18  number.
19    And I also was a union in -- a member of
20  a union in '72 when I drove for Santa Monica
21  Municipal Bus Line, but I'm sorry. I can't
22  recall specifically.
23  Q.  Have you been involved in any union activities

Page 13

1    since the seventies?
2    A.  No, sir.
3    Q.  Have you been involved or a member of any
4        other type of organization?
5    A.  Currently, I'm involved with the Macon County
6        Forestry Committee.  That's in Tuskegee.
7    Q.  What is the Macon County Forestry Committee?
8    A.  Basically, it's a committee between the
9        farmers and the professionals, those people
10       like extension agents and -- that like to have
11       that information that they can coalesce around
12       the farmers to help us be able to become
13       better farmers basically.  That's
14       essentially ...
15           It's a joining of the professionals and
16       the laypeople in an activity.  And, of course,
17       what we're trying to do is bring some of the
18       smaller kids -- well, 4-H-ers into the
19       organization, help them facilitate dates and
20       stuff for fishing, you know, as part of the
21       forestry commission, archery, you know, trying
22       to familiarize them with trees, you know, if
23       they want to become a forester, how to

Page 14

1    identify trees, marking trees.
2        They can get a chance to come down on my
3    little beach area and play in the sand and go
4    out for marine biology, you know, fishing.
5    And trying to provide some recreation, pull
6    them into -- in a coalesce -- ball where they
7    can have some kind of cohesiveness in terms of
8    where they can go for an outlet as well as
9    knowledge.
10       It's one of those community things.
11   We're kind of trying to do what Montgomery is
12   doing, Montgomery County, and what Tallapoosa
13   County is doing and then what Bullock County
14   is doing.  So it's working.  That's basically
15   what that forestry committee is about, trying
16   to make, actually, Macon County citizens
17   better citizens.
18   Q.  Are you an officer of that organization?
19   A.  No, sir, I'm not.
20   Q.  Have you been?
21   A.  Never.
22   Q.  What is the basis for your membership in
23       that?  Are you a landowner?

Page 15

1    A.  I am.
2    Q.  Do you have some forest land?
3    A.  We do.
4    Q.  Where is that?
5    A.  That's the same location that I gave you, 1321
6        Oliver-Carlis Road.
7    Q.  How many acres do you have there?
8    A.  Approximately 71.
9    Q.  Is that all in forest?
10   A.  No, sir.  There is some farmland, some
11       grassland, some wetlands.  A combination.
12   Q.  Is any of that land currently being
13       cultivated?
14   A.  No, sir.
15   Q.  When was the last time it was cultivated?
16   A.  We have not cultivated any at all in my
17       tenure.  My father-in-law did prior to my
18       arrival, but I think it was, like, in the
19       sixties.
20   Q.  This is land you acquired from your
21       father-in-law?
22   A.  My wife's property.
23   Q.  Other than being a member of the Macon County

Page 16

1    Forestry Committee, are you involved in any
2    other --
3    A.  Not that I can think of.
4    Q.  Are you involved in any Veterans groups,
5        anything like that?
6    A.  No, sir.
7    Q.  Your wife's name is Yvonne.  Did you say
8        Kindell was her maiden name?
9    A.  Yes, sir.  K-I-N-D-E-L-L.
10   Q.  Is she from the Tuskegee area?
11   A.  Yes, sir.
12   Q.  When were y'all married?
13   A.  October 4, 1976.
14   Q.  Did that marriage take place here in Alabama?
15   A.  It did.  In Tuskegee, Macon County Courthouse
16       under the Honorable Preston Hornsby.
17   Q.  Do you and your wife, Yvonne, have any
18       children together?
19   A.  Yes, sir, we have three daughters.
20   Q.  Starting with the oldest, what is her name?
21   A.  Tamika, T-A-M-I-K-A, middle name Janine,
22       J-A-N-I-N-E, last name Austin, A-U-S-T-I-N.
23   Q.  Approximately how old is she?

Page 17

1    A.   31.
2    Q.   Where does she live now?
3    A.   In Montgomery.
4    Q.   What kind of work does she do?
5    A.   She's an accountant for the city of
6         Montgomery.
7    Q.   Is she married?
8    A.   No, sir.
9    Q.   Who is your next older daughter?
10   A.   Keinee, K-E-I-N-E-E, middle name G-E-R-E-N-E,
11        Austin, A-U-S-T-I-N.
12   Q.   How old is she?
13   A.   29.
14   Q.   Where does she live?
15   A.   Montgomery.
16   Q.   Where does she work?
17   A.   She works at the rehab hospital, HealthSouth,
18        as an occupational therapist supervisor.
19   Q.   Is she married?
20   A.   No, sir.
21   Q.   Who's your youngest daughter?
22   A.   Metara, M-E-T-A-R-A, T-E-N-A-Y middle name,
23        Austin, A-U-S-T-I-N.  Unmarried.

Page 18

1    Q.   How old is she?
2    A.   28.
3    Q.   Where does she live?
4    A.   In Montgomery.
5    Q.   Where does she work?
6    A.   She works for Tuskegee University.
7    Q.   What does she do there?
8    A.   She's a nutritionist, and she's also the
9         extension agent representing Montgomery and
10        Macon County.
11   Q.   Do you have any children other than these?
12   A.   Not that I know of, sir.
13   Q.   Does your wife have any children other than
14        these?
15   A.   No, sir.
16   Q.   Is your marriage to Yvonne Kindell your only
17        marriage?
18   A.   It is.
19   Q.   Have you ever been arrested for anything,
20        Mr. Austin?
21   A.   I have, yes, sir.
22   Q.   What was that?
23   A.   Going back to '71, I had warrants for tickets

Page 19

1         out in California.
2    Q.   Was that unpaid traffic tickets?
3    A.   Yes, sir.
4    Q.   What happened with that?
5    A.   Well, I paid them off.
6    Q.   Any other arrests?
7    A.   Yes, sir.  See if I can keep these in line
8         here, now.  Came here.  I was arrested, let's
9         see, I think in '91 in Tuskegee.
10   Q.   What was that about?
11   A.   It was about placing a young man on the ground
12        who was throwing eggs at the parade at my
13        daughter and her friends.
14   Q.   What were you charged with?
15   A.   I'd have to pull that up.  I'm trying to think
16        specifically.  It was -- It wasn't a felony.
17        It was a misdemeanor.  So I can't -- I'm
18        trying to remember what I was charged with.  I
19        don't have the specifics, but I can pull that
20        up.
21   Q.   Was it assault?  Harassment?  Disorderly
22        conduct?  Do you recall?
23   A.   I can't recall, but I know I was convicted and

Page 20

1         placed on community service.  But I -- I'm
2         sure I can pull that up.  I'll be glad to do
3         that.
4    Q.   I would appreciate it if you would, please.
5         Was that handled in city court?
6    A.   It was.
7    Q.   Did you serve any period of time in the city
8         jail as a result of that conviction?
9    A.   No, sir.
10   Q.   Just ordered to pay a fine?
11   A.   I'm trying to remember if I was ordered to pay
12        a fine.  I don't recall.  I think I may have
13        been ordered to pay a fine and then community
14        service.
15   Q.   Any other arrests?
16   A.   Yes, sir.  I was arrested at the V.A. on my
17        job.
18        Actually, if I may, let me back up.  Let
19        me back up to 1990, I'm sorry, before the last
20        arrest we talked about.  I was arrested in
21        Tallapoosa County.
22   Q.   What were you charged with?
23   A.   Specifically, I really -- I'm trying to -- I

Page 21

1   can pull that. I have that at the house.
2   I've just got to locate it. But I was placed
3   in jail, let's see, one, two -- three times we
4   were in court. And the judge, the Honorable
5   Dale Segrest -- it may have been contempt; I'm
6   not sure -- placed me in jail on three
7   occasions as I objected to some of the
8   proceedings.
9   Q.  How long did you spend in jail on each of
10      those times?
11  A.  I went in initially that same day, and I think
12      I was down maybe 20 minutes. And he sent the
13      bailiff down and brought me back up. And I
14      came up and he asked me, I believe, if I was
15      ready to behave, and I indicated that I was.
16          The proceedings started again, and
17      within, I'd say, the next 15 or 20 minutes, he
18      ordered me back in jail. I was down for, I
19      think, the rest of the hearing.
20          I don't want to put you to sleep.
21  Q.  No. No.
22  A.  And he came -- he sent the bailiff down
23      again. I remember the bailiff's words. He

Page 22

1   said, Mr. Austin, he said, for God's sake, I'm
2   tired of walking up and down these stairs.
3   Said, when you get up there, just keep your
4   mouth shut.
5       And I recall telling him that I hadn't
6   planned on coming back up those stairs until
7   Channel 12 came down. I told him to tell the
8   judge that I was not coming up until he wrote
9   a statement -- because I was currently working
10  at the V.A. -- explaining why I would not be
11  attending my work session that evening because
12  we were running out of time. So he prepared a
13  statement which I have at the house. I'll try
14  and find it and I can provide you copies of
15  it.
16      After that, I came up. We shook hands.
17  My wife and my mother-in-law was in the
18  office. My wife was crying a little. My
19  mother-in-law was a little dazed. So we left.
20  Q.  Now, as I understand it, that was two times.
21      Was there a third time?
22  A.  Yes, sir, there was a third time. The third
23      time, again -- This time I was arrested at the

Page 23

1       V.A. by Probate Judge Alphonza Menefee.
2   Q.  Let me back up a minute. When you were
3       talking about 1990 in Tallapoosa County --
4   A.  Yes, sir.
5   Q.  -- I believe you said you were held in
6       contempt and put in jail three times, and I
7       think you only mentioned two.
8   A.  It was two. The third time I came out, you
9       know, he didn't -- he only came right after --
10      I insisted that he give me some kind of
11      statement that would enable me to get back to
12      the V.A. and work so they'd understand that I
13      had a reasonable excuse for not coming to
14      work.
15          The third time I was arrested in '93. I
16      believe it was September the 15th at the V.A.
17      Medical Center after an order by Probate Judge
18      Menefee that -- I was in contempt of court, I
19      believe, for not turning over documents and
20      papers that belonged to the principal. I was
21      an attorney-in-fact and an agent at that time
22      for my deceased cousin, Ruth H. Lewis, and I
23      was incarcerated for a period of 24 hours.

Page 24

1       And I can get that to you if you need it.
2   Q.  That's okay. I'm familiar with that case. I
3       believe there's litigation currently pending
4       on that; is that correct?
5   A.  I think so, sir.
6   Q.  In fact, it's on appeal to the 11th Circuit
7       Court of Appeals?
8   A.  That's correct.
9   Q.  Your lawsuit was dismissed here in the U. S.
10      District Court for the Middle District of
11      Alabama, and you've appealed that to the 11th
12      Circuit Court of Appeals?
13  A.  Correct.
14  Q.  Have you been arrested any other times?
15  A.  I have.
16  Q.  When was that?
17  A.  In '02. I believe it was September the 19th.
18  Q.  What did that have to do with?
19  A.  That had to do with carrying a concealed
20      weapon in the federal courthouse.
21  Q.  Was that here in Montgomery?
22  A.  No, in Cleveland, Ohio.
23  Q.  What happened with that?

Page 25

1    A.  Frankly, to be honest about it, I don't know
2         how they worked it.  I made contact with the
3         federal court on a number of occasions.  I
4         have that in writing, but I can't exactly tell
5         you the name of the attorney that was
6         involved.  But he indicated that he would get
7         on it and the chances are, based on the facts
8         of the case, I would not have to return to
9         Cleveland but, rather, I could possibly settle
10        that with a fine at the most in Opelika once
11        he got back to me.  This was December or
12        January of '03 -- December of '02 and into
13        January of '03.
14   Q.  Have you ever gone to court on that?
15   A.  No, sir.  He indicated that that's probably
16        what would happen if I went, that, you know, I
17        would probably have to pay a fine of $50 or
18        something.  As I was up there -- at that time,
19        I was involved in a case relative to our
20        property up there, a Section 8 tenant and the
21        Cuyahoga Metropolitan Housing Authority.
22             (Brief interruption.)
23   A.  There was a Section 8 tenant in my home, and

Page 26

1         the defendants were the Cuyahoga Metropolitan
2         Housing Authority.  They had breached the
3         agreement to pay, so ...
4              I had tried to get the case down here,
5         and, of course, they eventually transferred it
6         back to Cleveland.  And then I was on my way
7         up there then into the courthouse so I could
8         begin the process ...
9              MR. DUKES:  C-U-Y-A-H-O-G-A.
10             (Off-the-record discussion.)
11   A.  I don't think I've had another arrest since
12        then.
13   Q.  You seem a little uncertain.  Is there a
14        possibility that you've had an arrest since
15        then?
16   A.  No, sir.  I'm just trying to be as honest as I
17        can.
18   Q.  What type of legal proceeding was it that you
19        were involved in in 1990 in Tallapoosa County
20        where you were held in contempt?
21   A.  That had to do with a property transfer and an
22        attorney -- an attorney settlement that my
23        wife and the attorney had reached relative to

Page 27

1         some property that the attorney had assumed
2         control over relative to another relative who
3         lived in Illinois who did not really have the
4         authority.
5              And so my wife intervened, and eventually
6         it took us about 15 to 16 years.  We
7         eventually reached a settlement after double
8         assessing the property for a number of years
9         with the attorney.  But the attorney did
10        decease before the process was completed, and
11        we were told -- and we probably should have
12        gone, in our estimation, to probate court.  We
13        wound up somehow in circuit court after the
14        widower went and sought legal advice.
15             And that's where we were when this
16        transpired.  My objections were to the circuit
17        court that venue was improper as well as
18        jurisdiction and we should have been in the
19        probate court, so that's the essence of that.
20   Q.  Who was your lawyer at the time?
21   A.  Represented myself, pro se.
22   Q.  Who was your relative that you were helping
23        out with that?

Page 28

1    A.  That was my wife, Yvonne.
2    Q.  Was it her property?
3    A.  It was.
4    Q.  I believe you said you served in the Marine
5         Corps.
6    A.  Yes, sir.
7    Q.  What years did you serve?
8    A.  From approximately 11-25, I believe, '65
9         through January the 12th, 1968.
10   Q.  What kind of discharge did you receive?
11   A.  Honorable.  General under honorable conditions
12        I believe it was.
13   Q.  What were the -- What was the situation of
14        your discharge?
15   A.  How do you mean that?
16   Q.  Well, when you get a general discharge, you're
17        generally leaving under some reason other than
18        your end of your term of service or --
19   A.  I may have misspoken.  My service had
20        terminated.  I know I have an honorable
21        discharge, but I was just trying to see was
22        that attached or not.  Perhaps if not, then
23        please strike that.  There were no conditions

7 (Pages 25 to 28)

Page 29

1    attached to my discharge other than it was
2    honorable.
3    Q.  What was the highest rank you achieved?
4    A.  PFC.
5    Q.  What was your specialty?
6    A.  Infantryman.
7    Q.  Have you received any traffic citations in the
8        last five years?
9    A.  I have.
10   Q.  What were they?
11   A.  I'm trying to think. I'm going to have to
12       pull some of them up. I know recently in the
13       last couple of years, I've had safety belt
14       violations. I had one as recently as last
15       month, I believe. And then I think I had one
16       October of last year, and then I think I had
17       one on the 14th of February, thereabouts, in
18       2007.
19          Now, with respect to speeding tickets,
20       I'm trying to remember. How can I forget this
21       one down in Florida? Actually, it wasn't a
22       speeding ticket. It was a seat belt
23       violation. Scratch that. I'm sorry.

Page 30

1        What I can do is find out as far as
2    speeding tickets are concerned because I'm --
3    you know, I'm drawing a blank on those.
4    Q.  Were you cited by a state trooper in Florida
5        for speeding in the last five years?
6    A.  No, sir.
7    Q.  Have you ever been cited by a state trooper in
8        Florida for --
9    A.  Not for speeding.
10   Q.  What were you cited for?
11   A.  Seat belt violation.
12   Q.  Did you ever sue a Florida state trooper for
13       any reason?
14   A.  We're currently in litigation, sir.
15   Q.  What is that over?
16   A.  Seat belt violation. Officer James S.
17       Gaskett. Sergeant, as a matter of fact,
18       number 14.
19   Q.  Why are you suing him for a seat belt
20       violation?
21   A.  Well, according to what I've been able to
22       determine, there's a preemption by the state
23       of Florida, and you cannot charge a driver as

Page 31

1    a primary offense. That was the only offense
2    I had. In the state of Alabama you can, with
3    a $10 fine, unfortunately.
4    Q.  Where is that lawsuit currently pending?
5    A.  Northern District of Florida in, I think -- I
6        believe it's Gainesville. You know, I guess
7        Gainesville, but it said something about
8        Tallahassee. I don't know exactly if there's
9        a division. Chances are, there's a division.
10       I can get you that information if you'd like
11       me to.
12   Q.  Are you representing yourself in that lawsuit?
13   A.  I do, sir.
14   Q.  That was originally filed here in the U.S.
15       District Court for the Middle District of
16       Alabama?
17   A.  That's correct.
18   Q.  And that was transferred to Florida at the
19       request of the state of Florida?
20   A.  I believe it was by the assistant attorney
21       general there, and I did not contest it.
22   Q.  Have you had any speeding -- or received any
23       speeding citations in the last five years?

Page 32

1    A.  Okay. Yeah, I did. I got one in Ohio I know.
2    Q.  When was that?
3    A.  Specifically, I'm thinking '03, '04, somewhere
4        in there. I'm not sure. But I know -- I can
5        remember the officer because I was driving my
6        Suburban. I was -- come falling off of a
7        hill. I remember that one. But I don't
8        remember exactly which year.
9    Q.  That was 2003 or 2004 in Ohio?
10   A.  I would have to guess, but I can pull it up to
11       make absolutely certain.
12   Q.  What happened as a result of your receiving
13       that speeding citation?
14   A.  I paid it.
15   Q.  Have you received any other speeding citations
16       in the last five years?
17   A.  I'm trying to trick my mind to think. I can't
18       pull one up in my mind. But what I'd like to
19       do is be able to check and find out because I
20       can't -- I can't pull it up in my mind
21       currently.
22   Q.  Are there others that you've received in the
23       last five years that you just can't remember

Page 33

1      the details of?
2  A.  I don't -- No, I'm not saying that. I don't
3      know if I received any. This is the point.
4      If I could just get the information back to
5      you, I'd be glad to do that. I can call and
6      find out for sure.
7          I've had extensive travel between the
8      home up there in Cleveland and back here in
9      Alabama, so ... I'm struggling, trying to see
10     if I can come up with one. Right now, I can't
11     think of one, but I'm sure I can -- if there's
12     one out there, I'll locate it, get it back to
13     you, sir.
14         Oh, the speeding ticket, I'm sorry, the
15     one that I'm here on, were you referring to
16     that one as well?
17  Q.  Well, that and any others that you've
18     received.
19  A.  Yeah. I didn't know if you were referring to
20     that one. I know you knew about that one.
21     Yes, sir, that speeding ticket I got on the
22     5th of July in '07.
23  Q.  That was one that was written by Officer

Page 34

1      Dawson?
2  A.  Yes, sir, that gave rise to this lawsuit.
3          Once you turn 60, the mind is the first
4      thing to go.
5  Q.  Mr. Austin, do you have any relatives other
6      than your wife who are 18 years of age or
7      older who live in Macon County?
8  A.  I do have multiple, multiple of relatives.
9      Yes, sir, I do.
10  Q.  Who are they?
11  A.  I couldn't begin to tell you. I grew up in
12     Macon County, so it would be difficult for me
13     to tell you who they are, you know, because a
14     lot of the females are married. You know, I
15     don't know where they are. A lot of them --
16  Q.  Well, how many do you have in Macon County?
17  A.  I don't -- I wouldn't -- I couldn't begin to
18     tell you, Counselor, how many relatives I have
19     in Macon County. There may have been some
20     born in the last two or three years. A lot of
21     my relatives we don't necessarily communicate
22     for years until a family reunion or something,
23     so ...

Page 35

1  Q.  Well, I'm not concerned about the ones born in
2      the last two or three years. I'm only
3      concerned about those that are 18 or older.
4  A.  That's my point, though. I'm saying I
5      don't -- you know, see, a lot of times -- I
6      don't -- honest to God, I don't even -- my mom
7      and my dad, so-called father, was not
8      married. People come up to me all the time
9      and say, oh, you so-and-so. Did you know we
10     were kinfolk?
11         When you ask me that question, very
12     generic in nature, there's just no way I can
13     know. I don't even know if I would know even
14     if the facts were there because my lineage, my
15     tree -- I mean, I don't have that kind of
16     information.
17  Q.  What was your father's name?
18  A.  I don't even know that.
19  Q.  Well, you just referred --
20  A.  Yeah, I did refer to him, but I don't know
21     what his name was. I know what they called
22     him.
23  Q.  What did people call him?

Page 36

1  A.  C-H-A-L-K.
2  Q.  Chalk?
3  A.  Yes, sir.
4  Q.  What was his last name?
5  A.  H-A-R-R-I-S.
6  Q.  When did he pass?
7  A.  I don't know, sir. I was not involved in his
8      life.
9  Q.  What was your mother's name?
10  A.  My mother?
11  Q.  Yes, sir.
12  A.  Nola, N-O-L-A, Mae, M-A-E, Pearson,
13     P-E-A-R-S-O-N.
14  Q.  P-E-A-R-S-O-N?
15  A.  Yes, sir.
16  Q.  When did she pass?
17  A.  Frankly, I don't really know. She lived in
18     New Jersey. We were not that close. I would
19     guess '91. I can get you that information if
20     you would like because I do have the obituary.
21  Q.  Tell me approximately when.
22  A.  I'm thinking '90 or '91. That's what I would
23     think.

Page 37

1    Q.   Who were you raised by?
2    A.   My grandparents.
3    Q.   What were their names?
4    A.   James Austin. James A-U-S-T-I-N, and his
5         wife, Florence, F-L-O-R-E-N-C-E, Austin.
6    Q.   What was your grandmother's maiden name?
7    A.   Robinson, R-O-B-I-N-S-O-N.
8    Q.   Your mother's last name was Pearson. Did she
9         marry a Pearson?
10   A.   She did.
11   Q.   What was his name?
12   A.   Richard.
13   Q.   Is he still living?
14   A.   No, sir, they're both deceased. He
15        pre-deceased her, but I don't recall the year.
16   Q.   Now, if you have any relatives in Macon
17        County, what would be the family names other
18        than Austin and maybe some Robinsons?
19   A.   Well, you'd have the Keys.
20   Q.   K-E-Y-S?
21   A.   Yes, sir. You would have -- and I'm going to
22        make sure you get this name, Ruth, R-U-T-H,
23        H-A-R-K-L-E-S-S.

Page 38

1    Q.   H-A-R-K what?
2    A.   L-E-S-S. That was her maiden name. Lewis,
3         L-E-W-I-S.
4    Q.   So who was Ruth Harkless Lewis?
5    A.   Ruth Harkless Lewis was my cousin and, also,
6         she was the principal of the durable general
7         power of attorney that is currently in the
8         11th Circuit Court of Appeals.
9              Did I mention the Keys?
10   Q.   Yes, sir.
11   A.   Hill, H-I-L-L. Pitts, P-I-T-T-S. Johnsons.
12        The Floyds, F-L-O-Y-D-S. Did you put Harris
13        down? H-A-R-R-I-S. I mentioned my so-called
14        father's last name was Harris. I don't know
15        if you want to still put that down.
16             There are others I'm sure, Counselor, but
17        I'm having a hard time recalling them.
18   Q.   Your wife's maiden name is Kindell?
19   A.   Yes, sir.
20   Q.   Who are all of her folks?
21   A.   Well, the Kindells. Pughs. How do they spell
22        that? It may have been P-U-E-S or it may have
23        been spelled a different way. Counselor, can

Page 39

1         you come up with another way?
2    Q.   P-U-G-H-S?
3    A.   There you go. Should have stayed in high
4         school, shouldn't I?
5              Those I know about. Walkers. The
6         Lewises. Lewis. What was her daddy's --
7         granddaddy's folks? I can't even come up with
8         his name where she received that property.
9         I'll have to come up with that. It will come
10        to me now that I'm trying to think about it.
11        Phillips. Phillips. Emmit Phillips.
12             Randalls, R-A-N-D-A-L-L-S. They'll kill
13        me if I didn't mention that. That's about all
14        I can come up with now, but there are others.
15   Q.   Are you employed anywhere at the present time,
16        Mr. Austin?
17   A.   No, sir.
18   Q.   What's the last job that you had?
19   A.   I was at the V.A. Medical Center, and I exited
20        that position October 3.
21   Q.   What year?
22   A.   1993.
23   Q.   What did you do there?

Page 40

1    A.   I was what they called a pot sink man,
2         P-O-T S-I-N-K.
3    Q.   What does the pot sink man do?
4    A.   Washes the pots in the sink and also delivered
5         food up on the ward when I wasn't doing that.
6    Q.   Why did you leave that job?
7    A.   Dr. Reber retired me.
8    Q.   Dr. who?
9    A.   Reber, R-E-B-E-R.
10   Q.   What's Dr. Reber's first name?
11   A.   I can't remember that part. I can get it for
12        you. I have that information.
13   Q.   Where did Dr. Reber practice?
14   A.   He was at the V.A. Medical Center. I don't
15        know where else.
16   Q.   How did Dr. Reber come to retire you?
17   A.   Based on my skeleton, my condition of
18        arthritis and spondylosis, foraminal problems
19        and all the other things dealing with my back,
20        lower back.
21   Q.   So you have --
22   A.   Neck, shoulder.
23   Q.   You have spondylosis, arthritis, and what?

Page 41

1   A.  Christ, I can't remember those long terms, but
2       I can get that information to you.  It boils
3       down to skeleton problems in the disc, knees,
4       ankles, feet.  It all goes with old age.
5           I'm currently being treated, as I
6       mentioned in court the other day -- I did
7       attend yesterday and I have another
8       appointment Tuesday.  So if you'd like, I can
9       get you -- I can pull up that information if
10      you'd like.  I'll have them pull it up, and I
11      can bring it down to you.
12  Q.  Were you retired as a result of any specific
13      injury that you received on the job or at any
14      time?
15  A.  It gets a little tricky.  The doctor -- I
16      tried to get workmen's comp.  Because I was in
17      my forties, and all my life I had been
18      physical, so I just didn't believe the
19      physician's diagnosis at the time.  I didn't
20      know what arthritis really meant.
21          So once I came back and I was in consult
22      with Dr. Raj, I believe -- I believe it was
23      Dr. Raj, R-A-G, I think it was.  I'm not

Page 42

1       sure.  I was trying to get workmen's comp.
2       And at that time, I believe he indicated that
3       I had received an injury in jail -- in jail in
4       Macon County which was on top of my already
5       bad disc.
6           That was his -- if I'm not mistaken -- I
7       think I have that record.  I believe it was
8       Dr. Raj.  One of the physicians did put that
9       down in writing and, you know, so I'm stuck
10      with it.
11  Q.  So were you able to get workers' compensation?
12  A.  I was not because he mentioned that it was a
13      result of, he thought -- his exact words, that
14      the injury occurred in the Macon County jail
15      rather than on the job.
16  Q.  When were you injured in the Macon County
17      jail?
18  A.  Well, he surmised I was injured in the Macon
19      County jail on the 15th when I was arrested.
20  Q.  The 15th of when?
21  A.  September '93.
22  Q.  What kind of injury did Dr. Raj believe that
23      you received in the Macon County jail in '93?

Page 43

1   A.  Tweak in the back.
2   Q.  Is that how he described it?
3   A.  I don't -- I don't exactly recall how he
4       described it, but I know he just said -- it
5       was either Dr. Raj or another physician.  I
6       can't be certain of the physician.  And I
7       think I have that in writing.  I was adamant
8       that I should receive workmen's comp because I
9       was injured on the job.  Okay.
10  Q.  Did you have a specific injury on the job?
11  A.  He indicated that I did not.
12  Q.  Well, what is your -- what was your
13      contention?
14  A.  Well, I thought that maybe I did, you know.  I
15      thought that maybe I tweaked my back as the
16      pot sink man.  And then when I was taking the
17      garbage and the trash out, that when I went to
18      lean too far over -- but being a young man, I
19      never had that problem before -- leaned too
20      far over and the trash bag, I think, if I'm
21      recalling this correctly, was hung.  We had
22      these huge trash containers and then we'd just
23      flip it, and somehow it got hung in the

Page 44

1       trash.  And then I tried to just bring it back
2       normally, and after it wouldn't -- I was
3       leaning, and I just snatched it.  So that
4       was -- that was my contention at the time, but
5       I think that was in '91.
6           All right.  When I went back, I believe,
7       for a second time for treatment, I didn't -- I
8       didn't claim an injury at that point if I'm
9       recalling this correctly.  And so I did
10      indicate to him or whoever the physician was
11      at the V.A. -- I'm sorry.
12          After I was arrested at the V.A. and I
13      went to the Macon County jail, I was on the
14      second tier bunk.  They had -- It was the old
15      jail.  They had metal-like troughs, like pig
16      troughs.  I don't know if you're familiar with
17      them.  They're made like a U, and that's where
18      we slept.  And I remember I had my tennis
19      shoes underneath my head.  And when they came
20      in to wake us up -- I was familiar with that
21      sound.  They used to wake us up like that in
22      the Marine Corps, with the racket and noise.
23          They were smoking at the time, and I

Page 45

1      don't smoke. And I also was on allergy
2      medicine. I don't want to put you to sleep.
3      And the allergy medicine tended to give me --
4      get me a little drowsy. And it also, I think,
5      would make me a little stiffer. And I was
6      already stiff enough after being arrested for
7      being an agent --
8      (Brief interruption.)
9   A.   -- an agent to Ruth H. Lewis pursuant to her
10      durable general power of attorney, and I was
11      really distressed and angry about that. So I
12      knew I was stiff when I went into the
13      jailhouse and -- because they didn't want to
14      arrest me. They honestly didn't, but they had
15      no choice. Court order.
16      So then I went up and then when I went to
17      sleep, I didn't sleep that well because in a
18      jailhouse, you don't. So it was that morning
19      when I finally fell asleep and then they
20      woke -- I was awakened by this banging and
21      knocking and in this trough-like bed, I went
22      to -- I was asleep. I was in a daze. I
23      just -- I went to jump. I thought I was

Page 46

1      flat. And when I went to jump, I couldn't
2      make it. My legs went over first, and my
3      torso and my shoulders and stuff was still
4      inside. So I came up then and got out -- got
5      up, and then I felt, you know, the twinge of
6      it.
7      So when I went back, I think that's when
8      they decided at that point -- but I thought it
9      was relative to the injury I perhaps
10      received -- or what I contended to be an
11      injury some, what was it, two years prior.
12      That was my position, but the physician's
13      position was different.
14   Q.   Did you file a claim for workers'
15      compensation?
16   A.   Not that time, no, sir. I filed a claim --
17      Wait a minute. Hold on. I may have filed a
18      second claim. I'm not sure.
19   Q.   Have you ever drawn workers' compensation
20      disability payments?
21   A.   I draw disability payments now, but not from
22      workmen's comp.
23   Q.   Who do you get paid from now for disability?

Page 47

1   A.   From the federal system, federal employees
2      system.
3   Q.   Is that because you're disabled?
4   A.   Yes, sir.
5   Q.   What's your source of your disability for
6      that?
7   A.   When Dr. Reber retired me.
8   Q.   He just said you weren't able to continue
9      working?
10   A.   Yes, sir.
11   Q.   And that was because of your arthritis,
12      spondylosis --
13   A.   And other ...
14   Q.   -- knee problems, ankle problems, feet
15      problems, back problems?
16   A.   Neck and shoulder, yes, sir.
17   Q.   So you haven't worked since October of '93?
18   A.   I have not.
19   Q.   How much do you draw a month in disability?
20   A.   As I indicated to the court, it's 275 net per
21      month.
22   Q.   What's your gross per month?
23   A.   I could get you -- I can get you that

Page 48

1      information.
2   Q.   Do you have any other source of income?
3   A.   I personally -- not currently, no.
4   Q.   Have you in the last five or ten years had any
5      other source of income?
6   A.   Absolutely. Rental and farm.
7   Q.   Talking about the rental property in
8      Cleveland?
9   A.   Yes, sir.
10   Q.   Who owns that property?
11   A.   We do. My wife, my family, my mother-in-law,
12      my deceased father-in-law.
13   Q.   Is that through your wife that you got that?
14   A.   I would like to think so -- it's on my
15      wife's -- it's on my wife's side. It's my
16      wife's great aunt and my mother-in-law's
17      auntie, so biologically it's on my wife's side
18      of the family.
19   Q.   What rental property is that in Cleveland? Is
20      that a house?
21   A.   Yes, sir.
22   Q.   A single house?
23   A.   Two family dwellings.

Page 49

1    Q.  You said some income from the farm?
2    A.  Yes, sir.
3    Q.  Is that the approximately 70 acres you
4        mentioned earlier?
5    A.  Exactly.
6    Q.  What kind of income do you get from the farm?
7    A.  Currently, I'm not getting any. I think I
8        told you initially, if I'm not mistaken.
9        Currently I don't have any income that I know,
10       but this was up until a couple of years ago.
11   Q.  What kind of income were you getting from the
12       farm up until a couple of years ago?
13   A.  Cattle.
14   Q.  Whose cattle were they?
15   A.  Ours. Family -- family farm.
16   Q.  For the last couple of years, you have not had
17       any income other than your disability
18       payments?
19   A.  I don't -- I don't believe I have. You know,
20       I would have to -- I don't think I've had any
21       other income, not personally. I don't believe
22       I have. I'm trying to think. If I come up
23       with something, I can let you know. It's

Page 50

1        certainly nothing that I would be ashamed of.
2        I would love to have had some more income.
3            Well, let me put it like this. I can go
4        back because -- I wasn't thinking. IRA's. I
5        have some IRA's if that's ...
6    Q.  Are you cashing those in to get money out of
7        them?
8    A.  I've not cashed any in, but, you know, they do
9        draw income, but I've not cashed any in, no.
10           And let me mention this for the record.
11       My cousin, Ruth H. Lewis, did leave some
12       money, but it's in the hands of the state. So
13       I have not received any income there. It's
14       part of the lawsuit, so ...
15           Trying to see if someone else has been
16       nice to me.
17           MR. DUKES: We've been going about
18           an hour, a little over. Let's
19           take a five-minute break here.
20           THE WITNESS: I'm fine, sir, if you
21           want to ...
22           MR. DUKES: No, I need to take a
23           break here.

Page 51

1            THE WITNESS: Okay.
2            (Brief recess was taken.)
3    A.  I did think of one other ticket, Counselor.
4    Q.  You said you'd remembered another ticket?
5    A.  Yes, sir.
6    Q.  When was that?
7    A.  I don't know which year. It had to be in the
8        eighties. Did you say within the last five
9        years?
10   Q.  Yes, sir.
11   A.  Oh, okay. I'm trying to think. I'll let you
12       know if I come up with one in the last five
13       years.
14   Q.  Mr. Austin, as I understand it, your current
15       lawsuit against the City of Tuskegee, Mayor
16       Ford, Judge Bulls, Chief Patrick, Mr. Thomas,
17       and Officer Dawson arises from a traffic stop;
18       is that correct?
19   A.  An unlawful traffic stop.
20   Q.  When did this traffic stop occur, Mr. Dawson?
21   A.  Austin.
22   Q.  Austin. Excuse me.
23   A.  No problem. This was -- Make sure. July the

Page 52

1        5th, 2007.
2    Q.  What time of day did this occur?
3    A.  8:40 a.m.
4    Q.  Where did this occur?
5    A.  In the county of Macon, outside of the
6        municipal corporate city limits of Tuskegee.
7    Q.  I understand that's your contention. Where,
8        exactly, did it take place with regard to any
9        highways, landmarks, anything like that?
10   A.  Oh, okay. Yes, sir. It was specifically
11       approximately a quarter of a mile north of the
12       Tuskegee city limits on State Highway 81
13       near -- it was right off -- there's a state --
14       there's a state power line, I believe, power
15       line which would be the northern corner of the
16       Moton Field fence, right at that area.
17           I was about in that vicinity when the
18       blue light flickered, and Officer Dawson was
19       in the northern-most parking lot of the old
20       Tuskegee Western Inn, just on the shoulder
21       there in the morningtime. And as I came
22       around the bend, she flicked her blue lights.
23           In terms of where I was in proximity to

Page 53

1   the city limit sign, maybe a third to a fourth
2   of a mile.
3   Q.   Well, let me put it this way.  Were you south
4        of I-85 on Alabama Highway 81 when this
5        occurred?
6   A.   I was south of 85 on Alabama Highway 81.
7   Q.   Was Officer Dawson south of I-85 on Alabama
8        Highway 81 when this occurred?
9   A.   That's correct.
10  Q.   And all the events involving you and Officer
11       Dawson occurred along Alabama Highway 81; is
12       that correct?
13  A.   State Highway 81, yes, sir.
14  Q.   And that was all south of I-85; is that
15       correct?
16  A.   That's correct.
17  Q.   And you were driving northbound?
18  A.   I was.
19  Q.   And Officer Dawson was looking southbound?
20  A.   Yes, sir.
21  Q.   And as you were proceeding northbound, you saw
22       the blue lights on her police car come on?
23  A.   As I proceeded northbound at -- I was at the

Page 54

1   north-most corner of Moton Field.  There's a
2   fence, and then there's a power -- I guess
3   it's Alabama Power line.  Of course, there are
4   hedges.  There are trees.  So the road curves
5   around.
6        Like I said, she was in the northern
7   parking lot, just easing along the shoulder.
8   All right.  And as I come around the curve,
9   when she saw the front of my vehicle, the
10  light came on.  Once that happened, as I
11  approached her, I hit my signal, left signal,
12  turn signal, and that was to go into the
13  south-most parking lot of the facility.
14  That's why she ticketed me.
15  Q.   We're talking about what years ago used to be
16       a Holiday Inn and it's been several other
17       things since then?
18  A.   Western Inn.  Tuskegee Inn.  Yes, sir.
19  Q.   That's right off of the exit of I-85 there on
20       Alabama Highway 81?
21  A.   Well, it's south of the exit but, you know,
22       you're approaching the exit.
23  Q.   It's south of I-85?

Page 55

1   A.   Yes, sir.  I was headed to Auburn, so it was
2        south.
3   Q.   How fast were you traveling when you saw
4        Officer Dawson turn on her emergency lights?
5   A.   Actually, I never looked down at my
6        speedometer at that time.  I can't say how
7        fast I was driving.  My mind was -- I was just
8        driving.  I wasn't checking the speed at that
9        time.
10  Q.   If Officer Dawson testified that you were
11       driving 60 miles per hour, would you have any
12       basis to dispute that?
13  A.   As I think about it, I would dispute that to
14       the extent, as I've indicated earlier, I
15       wasn't aware of how fast I was driving, so it
16       comes in two parts.
17            Officer Dawson then stated to me after
18       she pulled me over that that was a 45
19       mile-an-hour zone.  I've always known that to
20       be a 55 mile-an-hour zone.  So that's where
21       the dispute would come in at as to the maximum
22       speed limit in that area.
23            But, now, as far as how fast I was

Page 56

1   driving, honestly, I didn't -- I wasn't paying
2   attention to the speed.
3   Q.   So you don't know how fast you were driving at
4        the time; is that correct?
5   A.   At the time, I did not.  No, sir, I don't
6        know.  But I can say this for the record, that
7        I was convicted by Judge Bulls, and he
8        believed that I was driving 55.  That's the
9        conviction.
10           So I stated in the court at that time
11       before him I didn't know how fast I was
12       driving.  All right.  Officer Dawson testified
13       it was 60 miles an hour according to her radar
14       as she shot back into the city.  Judge Bulls
15       determined my speed to be 55.  That's of
16       record.
17  Q.   What is your basis for saying that the area
18       where all this occurred is outside the
19       municipal limits of the city of Tuskegee?
20  A.   The sign that says city of Tuskegee.  And in
21       Alabama, according to what little I know, you
22       use those signs.  Those signs speak.  And
23       absent of that sign, the law is silent.

Page 57

1    So that's what I -- I've always used that
2  city limit sign, and I have traveled
3  extensively across this country. If I see a
4  sign that says police jurisdiction, bam,
5  that's where it's at. If I see a sign that
6  says city of Gainesville, Florida, that's
7  where it's at, because I trust our authorities
8  and I trust the state because they work
9  together to make sure that they place those
10  signs there accordingly.
11    Also, if a sign says a certain thing and
12  it doesn't mean that and we as citizens rely
13  on that, Counselor, then that's to the
14  detriment, so detrimental reliance would
15  certainly be at issue here. If, in fact,
16  that's not the case, as the city of Tuskegee
17  as well as the state owes us citizens a duty
18  to make sure that when the sign says city
19  limits, that's exactly what it means. And if,
20  in fact, it's not the city limits, then they
21  best put it there.
22  Q.  Well, let me ask you this, Mr. Austin, since
23  you're talking about detrimental reliance.

Page 58

1  How did you rely on that sign to your
2  detriment?
3  A.  Here I am now for an example. This is one --
4  See, if the sign had have been -- had not have
5  been there and it had have been someplace
6  else, then I wouldn't be here if it was -- for
7  an example, if they placed the sign two miles
8  up on the other side of the interstate, all
9  right, then I wouldn't -- I would have paid
10  the ticket and went to sleep.
11  Q.  Well, but your -- the detrimental reliance as
12  a legal concept is you're relying on that fact
13  as you perceived it at the time.
14  A.  Yes, sir, at the time. Exactly.
15  Q.  On the 5th of July of 2007, how would your
16  conduct have been any different if that city
17  limit sign had not been there?
18  A.  Well, specifically for me, it depends upon
19  where the city limit sign was. Where would it
20  have been in your scenario?
21  Q.  My question to you, Mr. Austin, is on the 5th
22  of July 2007 --
23  A.  Yes, sir.

Page 59

1  Q.  -- what would have been different about your
2  conduct at approximately 8:40 a.m. if that
3  city limit sign you're referring to had been
4  in a different location?
5  A.  Well, for an example, if it had been up to the
6  interstate, then it would have been 45 miles
7  an hour, and I would have been driving 45.
8  That would have been the first thing.
9  Q.  Well, hold on. Hold on. You're saying --
10  putting another change in there, 45 miles an
11  hour. Whether the speed -- that city limit
12  sign is there or not, I'm asking you what --
13  just the fact of having that city limit sign
14  there, if it had been somewhere else, how that
15  would have affected your conduct at 8:40 a.m.
16  on July 5th of 2007.
17  A.  I'm saying if it had been placed -- if that
18  city limit sign had been placed up at the
19  Tuskegee -- at the Tuskegee Inn for an example
20  or if it was moved up to the interstate, then
21  the maximum speed limit inside of all cities
22  in the state of Alabama unless I'm wrong is
23  45, and then I would have been driving 45.

Page 60

1    But because the speed limit sign -- city
2  limit sign was where it was situated, once I
3  made a left turn, it didn't take me long to be
4  out of the city limits. I've lived there 30
5  something years and I know that in the state
6  of Alabama, the speed limit, maximum, 55
7  except for four-lane roads which can be up to
8  65 except for other conditions.
9    See, so I've always driven 55 outside of
10  the city speed limit -- outside the municipal
11  speed -- city sign. And that's why I knew I
12  was driving more than 45. In my mind, I had
13  to be driving more than 45, but I also knew
14  that inside the city limits, inside the city
15  limits, it's ten miles slower. I drive it all
16  the time. When I came here, I drove it. See,
17  that would have been the major difference.
18    And the other thing would have been, I
19  wouldn't have been stopped by Officer Dawson
20  because I wouldn't have been driving 55. I
21  was driving 55 according to -- according to
22  the judge, now, according to the judge. I
23  would not have been driving 45, because that's

Page 61

1    what I was convicted of, in a 45 mile-an-hour
2    zone if the city limit sign had have been up
3    where the defendants are claiming that it
4    existed after 2000 -- prior to 2005 or
5    something, whatever their position is.
6        So I relied on the city limit sign where
7    it was and is.
8    Q.  So you're saying that you relied on the
9        location of that city limit sign --
10   A.  To determine the speed.
11   Q.  -- based on your knowledge of the law to drive
12       at 55 miles an hour?
13   A.  No, not exactly the way you're stating it.
14       I'm saying that I relied on the city limit
15       sign to determine the speed limit, which is 45
16       miles an hour.
17           Now, Counselor, I could be wrong.  I
18       mean, I may have misread it.  I'll be willing
19       to go back and look at it.  I'm not a lawyer.
20       But, now, from all I've been able to read,
21       city limits for the most part in the state of
22       Alabama are now pretty level at 45.
23           You know, up -- when you make a left turn

Page 62

1    there, you have to drive 45 for a distance.
2    Then once you pass the city limit sign, it
3    goes to 55 there, just specifically there.
4    All right.  If you're going down 29 and 80
5    headed north, the same scenario applies.  But
6    if you're going 80 west, at some point those
7    four lanes come into play.  And once they come
8    into play, it goes from 45 into 55, I guess,
9    and then to 65, because it's posted.
10       That's my home.  I've always lived
11   there.  By the way, I love Tuskegee.  This is
12   not about Tuskegee.  It's about the law.  And
13   I just relied on the sign.  If the sign wasn't
14   where it was, I wouldn't have been driving 55.
15   Q.  So you relied on that sign to drive at above
16       the posted speed limit?
17   A.  Absolutely not.  I relied on that sign until I
18       drove through that sign, which was 45 miles an
19       hour.  After I pass the sign outside of the
20       city limits, it's 55 as noted by Officer
21       Dawson in her affidavit.  It's 55 miles an
22       hour.  It's always been 55.
23           Man, I travel that road -- oh, God, I

Page 63

1    wish I had peanuts for the time I've traveled
2    that road.  It's never been an issue.  That
3    has never been an issue.  It's always been
4    55.  And you go on into Notasulga until you
5    reach a certain place -- you have schools
6    there.  The speed limit gradually comes down
7    based on the neighborhood and et cetera, et
8    cetera, the closer houses, et cetera.  On 199,
9    the speed limit is 55 as soon as I get outside
10   the city limits.  State Highway 199 -- never
11   been an issue.  That has never been an issue.
12   Q.  At the time of this incident on July 5, 2007,
13       what was the posted speed limit to the best of
14       your recollection between Moton Field and I-85
15       on Alabama Highway 81 there?
16   A.  The posted speed limit was always 55.  Was
17       always 55.  There was never an issue about
18       that.  The posted speed limit today --
19   Q.  I'm not asking the posted speed limit today.
20   A.  I'm saying it's still the same.  It's still
21       the same.  And Officer Dawson acknowledges
22       that.
23   Q.  Are you saying that Officer Dawson in her

Page 64

1    sworn affidavit that the speed limit was 45
2    miles an hour there was mistaken?
3    A.  In her sworn affidavit it was mistaken?  On
4       July the 5th?  I'm not saying Officer Dawson
5       was mistaken on July the 5th with respect to
6       her sworn statement with regard to the
7       ticket.  I'm stating that Officer Dawson knew
8       based on her 20 years that that speed limit
9       was 55, and she deliberately placed it at 45
10      pursuant to the police department.
11          Officer Dawson is just a peon.  I know
12      how this stuff flows down the hill.  So she
13      wouldn't have been doing nothing that she
14      wasn't told to do.
15   Q.  Is it your contention that on July the 5th of
16      2007 on Alabama Highway 81 between Moton Field
17      and I-85 where you were stopped that the
18      posted speed limit was 55 miles per hour?
19   A.  I'm saying emphatically that the speed limit
20      in that area has always been -- it was that
21      day, and it is now -- 55 miles an hour outside
22      of the municipal corporate city limits,
23      anywhere outside of that city sign.  So

Page 65

1  clearly where you're placing me and where she
2  stopped me, yes, sir, it's 55.
3  Q.  Let me ask you this again, and please answer
4    yes or no.  Irregardless of where you contend
5    the city limit sign is or was, on July the 5th
6    of 2007 at 8:40 a.m., is it your contention
7    that the speed limit that was posted on
8    Alabama Highway 81 between Moton Field and
9    I-85 was 55 miles per hour?
10  A.  Yes, sir.
11  Q.  Do you have any photographs or other evidence
12    of that?
13  A.  No, I sure don't.  I indicated that in my
14    response to you.  I don't have any
15    photographs.  I just know my experience.  I've
16    lived there 30-plus years.
17  Q.  Well, based on your experience of living there
18    30 some-odd years, where is it your contention
19    that the northern city limits of the city of
20    Tuskegee were on July 5 of 2007?
21  A.  On July 5, 2007, the point that I'm concerned
22    with, the border that crossed State Highway 81
23    where the city limit sign was placed.

Page 66

1  Q.  And that's near the end of Moton Field?
2  A.  Well, yes, sir.  It's right where the city
3    limit sign was placed on that day.
4  Q.  Are you aware that the city limits of the city
5    of Tuskegee were extended by the act of the
6    Alabama legislature in 2004 to a point north
7    of I-85 on Alabama Highway 81?
8  A.  I would dispute that that has happened because
9    had it happened, the city -- we're getting
10    right back to my point earlier -- should have
11    moved the sign to accommodate the boundaries
12    with the blessing of the state and the state
13    director and the engineers.  They all get
14    together on that.
15      Now, from what I've been able to read
16    based on what the defendants have provided to
17    me as a defense, it appears to me that parcels
18    of land -- now, I've heard -- you know, I
19    don't know Tuskegee's business.  I live on the
20    outside.  But based on what I see, I see
21    parcels of land that has been incorporated.  I
22    know that they're looking at the black
23    airmen's museum for an example.

Page 67

1        (Brief interruption.)
2  A.  The Tuskegee black airmen's museum, I know
3    they're looking at that.  They're looking at
4    the possibility of bringing in businesses.
5    All right.  So a lot of -- couple of old
6    service stations that were there -- one area
7    has been cleaned off considerably, and I was
8    told that they were going to eventually put a
9    Waffle House or something there.  So I'm
10    assuming for tax purposes it may have been
11    extended.
12      But my concern is not about the city and
13    its ability to bring in tax revenue from
14    buildings and extending land and that sort of
15    stuff.  I'm not concerned with their
16    jurisdiction.  I'm concerned with the city's
17    municipal line that crosses the state of
18    Alabama Highway 81.  That's where I was
19    driving.  Counselor, there are specific laws
20    that relate to the state highway and the
21    corporate city limits.
22      Now, if, in fact, they decide to purchase
23    property north of that particular border that

Page 68

1  crosses, that's fine.  But I'm interested in
2  right where that line crosses the state
3  because that's the only -- that's the only
4  thing that concerned us.  That's where the
5  stop -- that's why I'm in court, because the
6  municipal city limits said for tax -- for
7  ticket purposes relative to 38 -- I'm sorry,
8  32-A -- whatever it is, 5A-171, subparagraph 9
9  or thereabouts.
10      The municipal city limits for the purpose
11  of issuing tickets, that's the only thing I'm
12  concerned with, not the addition of parcels of
13  land.  I'm proud of Tuskegee for doing that.
14  But the city limit sign represents where the
15  city limit sign supposed to be hopefully, and
16  that represents the border crossing the state
17  highway.
18      Now, whether they extended parcels of
19  land all the way to New York, that's fine.
20  But as you know, boundaries don't -- they're
21  not just straight.  They zigzag all kinds of
22  ways.  But my concern is between the ditches
23  on State Highway 81, where does the municipal

Page 69

1  city line cross?
2      And if that particular sign was not where
3  it's supposed to have been, then I can
4  guarantee speed traps. I'll steam if that
5  sign is not where it's supposed to be this
6  morning, sir, because Montgomery would not
7  tolerate that.
8  Q.  So you're saying between the ditches, in other
9      words, the highway right-of-way --
10 A.  No, sir.
11 Q.  -- you're concerned with where that is with
12     regard to the city limits?
13 A.  No, sir. I'm not concerned with the highway
14     right-of-way because based on what little
15     limited knowledge I have -- correct me if I'm
16     wrong -- police jurisdiction can extend -- it
17     goes outside of the city limits. They can go
18     out there for the purpose of constituting
19     arrests for felons and that sort of stuff.
20     But for ticket purposes -- we're not
21     talking about arrest warrants. Arrest
22     warrants, they can go out there. As long as
23     they -- They can go out past the corporate

Page 70

1  limits and do that. The law specifically says
2  that they can't go outside of their municipal
3  corporate city limits to issue tickets, and
4  specifically the reason for that is you have
5  the sheriff's department. You have the state
6  department. The city has enough duties.
7  They're not even performing well inside the
8  city limits. Ask President George Bush when
9  he came down and talked about the potholes.
10     See, this is not about me not loving
11 Tuskegee. I love Tuskegee. This is about us
12 being honest with citizens. There are a lot
13 of citizens, sir, that comes from Montgomery
14 that work there because you've got dual V.A.
15 campuses now. So as a veteran and just as a
16 human being, I'm just concerned with people
17 who comes in and then police officers stop and
18 tell them that the city limits -- they don't
19 bother with the city limits.
20     They tell them it's 45 miles an hour out
21 there when they know dog-gone well the city
22 limits is way ahead of them. It's got no
23 basis. There's no support for that, sir. 45

Page 71

1  miles an hour ends at the corporate city limit
2  border, wherever that is. This is the only
3  position I have. I love Tuskegee. I would
4  have paid that ticket in a heartbeat if that
5  had been the case.
6      There have been other rumors -- people
7  talk about how the sheriff's department and
8  the police department are always in it because
9  they're overextending their jurisdiction. I
10 said, well, hey, maybe so, but you're not
11 talking -- jurisdiction and corporate city
12 limits are two different things. Don't
13 confuse them.
14     I'm only concerned with where that line
15 crosses State Highway 81 because once it does,
16 55 mile-an-hour sign pops. If that's not the
17 case, if that weren't the case, then Tuskegee
18 has got an awful lot of explaining. And I
19 would think the state of Alabama would be
20 interested perhaps in joining this suit.
21     It's just not fair. It's not fair to
22 people who come from out to come in. God
23 knows how many tickets Ms. Dawson and Tuskegee

Page 72

1  probably process illegally on people who were
2  minding -- who are minding the speed limit,
3  driving the speed limit. And in my case, I'm
4  driving the speed limit according to the judge
5  and he fines me. That's a bitter pill to
6  swallow, Counselor. That's a bitter pill.
7      I'm sorry, sir.
8          MR. DUKES: Would you like to take a
9          break for a moment, Mr. Austin?
10         THE WITNESS: I can go on.
11 Q.  Mr. Austin, are you aware of Act Number
12     2004-248 of the Alabama legislature?
13 A.  I'm not, sir. You guys provided me some
14     information, but I was never aware of an act
15     that extended the city limits from where the
16     sign was placed. I should have been made
17     aware of that and everybody else should have
18     been made aware of that simply by moving the
19     sign. That's my position. I don't need to be
20     aware of it. If the city limits is out
21     there -- If Tuskegee city limits is out here,
22     the sign should represent that. Absent of
23     that sign, the law is silent.

18 (Pages 69 to 72)

Page 73

1  Q. Are you aware now that act 2004-248 of the
2     Alabama legislature went into effect in July
3     of 2004?
4  A. Based on the documents that you provided me,
5     sir, but I couldn't -- I couldn't swear on it
6     because I don't know anything about it. But
7     based on the documents that you provided me,
8     you've indicated that parcels of land and
9     stuff happened, but that is not my concern.
10    Those issues are side issues. The only issue
11    I'm concerned with -- that's an irrelevant
12    issue.
13       The only issue I'm concerned with is
14    where -- today, where is the city limit sign
15    honestly placed, legally? And I do know this,
16    that the state of Alabama, the state director
17    for public safety and then the engineers for
18    the city and county and then the state
19    engineers get together on tweaking those
20    lines, and I have not seen anything that would
21    indicate that the city corporate limit sign
22    were -- I'm sorry, should be moved to
23    accommodate the line if, in fact, it has been

Page 74

1     moved.
2        So the sign tells me that the line has
3     not been moved across -- that crosses the
4     state highway. I'm not arguing with you, and
5     I make this clear, about other parcels of
6     land, other right-of-ways that have been
7     extended to Tuskegee. My Lord, I hope that
8     they have got that, sir. We need it, and we
9     deserve it.
10       Again, I'm only -- Remember, there's one
11    traffic stop here, and it's about where the
12    city limit sign was and where it was, not
13    where it is now.
14 Q. Mr. Austin, are you aware that the municipal
15    limits of the city of Tuskegee were extended
16    to include the right-of-way of State Highway
17    81 from the old Tuskegee city limits to a
18    point north of I-85 in July of 2004?
19 A. Based on what you guys are saying, that's your
20    contention. You know, you're the defendants
21    in this case, so it's your contention. But
22    honestly, I have not been provided with any
23    concrete evidence that that's the case, but

Page 75

1        I'm aware that that is the defendants'
2        contention.
3  Q. Well, have you had the opportunity to review
4     Act 2004-248 of the Alabama legislature signed
5     into law by the governor of the state of
6     Alabama in 2004?
7  A. I am not aware of that act to a major degree.
8     I'm aware of some of the documents you guys
9     provided to me as defendants in this case, but
10    I have not looked at the act itself. And,
11    frankly, I don't know if I could even
12    interpret that act.
13       But what I have seen, Counselor, is the
14    city limit sign. That's all I'm interested
15    in. Where is the city limit sign? Where
16    should the city limit sign be if it's not
17    there? I can only go by where the city limit
18    sign is.
19 Q. Mr. Austin, do you dispute that Act 2004-248
20    of the Alabama legislature extended the city
21    limits to include the right-of-way of Alabama
22    Highway 81 to a point north of I-85?
23 A. Currently, my position is I'm in need of more

Page 76

1     factual development. It's wait and see --
2  Q. Well, what --
3  A. -- for me -- Go ahead. Excuse me.
4  Q. I'm sorry. Go ahead. Finish your response.
5  A. It's a wait and see, and there has to be more
6     factual development, okay, within this issue.
7     So as far as I'm concerned, that information
8     is out there and it's still pending, all
9     right, so it's blowing in the wind. But I'm
10    aware of the fact that Tuskegee -- it is
11    Tuskegee's contention that that is the case.
12 Q. Well, what factual development do you need to
13    be able to say whether or not the Alabama
14    legislature extended the city limits of
15    Tuskegee back in 2004?
16 A. The municipal -- The Tuskegee city limit sign
17    has to be moved to accommodate that.
18 Q. What law says that the city limit sign has to
19    be moved?
20 A. I'm not referring to the law other than --
21    frankly, I don't have it here, but it does
22    state this. Absent of a sign, the law is
23    silent. So therefore, once the Tuskegee city

Page 77

1    limit sign -- and I can pull it up and bring
2    it. I don't have it here. Once that city
3    limit sign moves, I have to follow that city
4    limit sign. Absent that city limit sign
5    moving, then I'm going to stick with the city
6    limit sign.
7        And if a police officer stops me and says
8    to me the speed limit out here used to be 55
9    when you first moved, we've extended that, but
10   the -- the city limit sign is still in the
11   same place, we just decided to leave it there
12   so we can entrap people when they come in here
13   because most law-abiding citizens would slow
14   down if they saw that Tuskegee city limit sign
15   up there because most of us read and we are
16   aware that the city limit -- within any city
17   limits is 45 miles an hour. Most of those
18   people would not have been driving 55 where
19   she can claim that they were driving 55 in a
20   45 mile-an-hour zone, and that constitutes,
21   sir, a major speed trap.
22       And, again, this can be resolved simply
23   by dealing with the state and the city's

Page 78

1    engineer. But, now, I can't rely just on the
2    defendants' position and say that's, in fact,
3    law. There has to be more factual
4    development. And that factual development
5    will come once the state is involved, and then
6    they can provide both of us with exactly where
7    that line is supposed to be.
8        And if the City of Tuskegee has been
9    derelict in their duty in moving that
10   particular city limit sign to accommodate the
11   truth rather than leaving it where it is so
12   they can make profit from it, then Tuskegee is
13   in a world of hurt. They're in a world of
14   hurt.
15       So I hope that's not their defense. I
16   truly hope that's not their defense. With all
17   due respect, Counselor, Tuskegee is in
18   Alabama. All of us suffer if you have a city
19   that's violating the state laws. All of us
20   suffer.
21   Q.  What state law are you contending that the
22       City of Tuskegee has violated in this
23       instance?

Page 79

1    A.  I already cited it. I'm going to specifically
2        go back to it. It's going to take me a while
3        because I forget the -- oh, where is it?
4        Where did Ms. Dawson put that at? 32-5A-171,
5        subparagraph 9, state of Alabama.
6    Q.  How did the City of Tuskegee violate that
7        provision of the Alabama Code?
8    A.  By stopping the plaintiff outside of their
9        municipal city limits and issuing an unlawful
10       ticket.
11   Q.  It's your contention that where that stop
12       occurred on Alabama Highway 81 south of I-85
13       was outside the Tuskegee municipal limits on
14       July 5 of 2007?
15   A.  Municipal city corporate limits. City limits,
16       yes, sir, in relationship to 81 and for
17       ticket-writing purposes, specifically for
18       traffic ticket-writing purposes.
19   Q.  Do you dispute that Act 2004-248 of the
20       Alabama legislature is the law of the state of
21       Alabama?
22   A.  Again, more factual development, because I
23       don't -- I don't have -- I don't have all of

Page 80

1        the information. The information I received,
2        with all due respect, Counselor, came from the
3        opponent in this case, which is the
4        defendants. But I did receive some
5        information, but I'm virtually sure that's not
6        all the information in the act.
7    Q.  Well, have you taken the opportunity to go
8        review for yourself Act 2004-248 --
9    A.  I have not. I've been very busy trying to
10       promulgate my case. That will be for a jury
11       to decide.
12   Q.  Well, Mr. Austin, your whole case rests on
13       where the city limits existed of the city of
14       Tuskegee, and Act 2004-248 extended the city
15       limits to a point north of where you were
16       stopped and it was prior to the date that you
17       were stopped, but you have not gone to
18       determine anything about that act?
19   A.  I wasn't aware that that act did that until
20       the defendants placed that in their motion for
21       summary judgment. However, I am very aware
22       the 30 years I've lived there -- and I'm
23       only -- again, I'm right back to the only

Page 81

1    thing that tells me anything about the city
2    limits, and that's that city limit sign.
3        I'm very focused on that city limit sign
4    that crosses -- the border that crosses the
5    State Highway 81. That's the only focus right
6    now of my case. It has nothing to do with
7    additional parcels of land and right-of-ways
8    extended beyond that point.
9        And my position is now, again, if the
10   city has extended that corporate line and the
11   city limit sign is now false and
12   misrepresentative of the city limits, that's
13   another suit, sir.
14  Q. Is your whole suit, then, based on the fact
15      that you contend that that city limit sign is
16      in the wrong location?
17  A. No, sir. I never said the city limit sign is
18      in the wrong location. It's been my position
19      that the city limit sign is in the right
20      location because it's been there for 30-plus
21      years, and we've always relied on the city
22      limit sign.
23          It would be to my detriment now if, in

Page 82

1    fact, the city limit sign is supposed to have
2    been moved and has not been moved which leads
3    to Officer Dawson saying perhaps -- based on
4    what you're saying and the city's contention,
5    the defendants' contention, that perhaps leads
6    to Officer Dawson out there at the end saying
7    that the speed limit is 45 miles an hour,
8    which also is the reason why I wound up paying
9    $120, being fined, and then having points
10   against me for, first of all, not speeding
11   because my contention -- it always has been
12   and it always will be -- is the speed limit is
13   55 there.
14      All right. The city says it's 45. And
15   based on what you're suggesting, they're
16   claiming that the sign where it is now really
17   doesn't exist. And there is no other city
18   limit sign up there anyplace else. So then we
19   citizens of the United States, no matter where
20   we come from, we'll just have to figure that
21   out.
22      And if we're driving there -- you've been
23   there 30 years and you've been driving that

Page 83

1    same 55 miles an hour after you get outside
2    the 45 mile-an-hour zone ... got you. Guess
3    what? This act, it was extended. I'm
4    interested in knowing how many other people
5    have been duped and how many people's property
6    have been taken as a result. That brings in
7    14th Amendment rights, sir.
8        That's my position. The city -- All the
9    city has to do is prove that by moving the
10   city limit sign up there by the interstate,
11   but it won't help them now because the 11th
12   Circuit Court of Appeals is only interested in
13   where was the sign then.
14  Q. Is it your contention that where the sign is
15      determines where the city limits is?
16  A. My contention is that where the sign is, it
17      should determine the city limits. And if it
18      doesn't determine where the city limits really
19      are as far as crossing that state highway,
20      again, Tuskegee is in -- they're in a heap of
21      big trouble because that sign should determine
22      that. It should determine that. We as
23      citizens should know that that sign is placed

Page 84

1    there honestly, truthfully, and it's not there
2    for some kind of hoax.
3   Q. What kind of hoax are you alleging that the
4       City of Tuskegee was carrying out by not
5       moving that sign to reflect the change of the
6       city limits?
7   A. Well, they have a duty if, in fact, that's the
8       case. I'm not saying that that is the case.
9       My position is this. That's Tuskegee's case.
10      That's their argument. But my position is
11      this. I'm going to rely on the sign wherever
12      it is. I'm not going to argue with the sign.
13      The sign is not argumentative here. Tuskegee
14      is arguing with its own sign. That's a
15      conflict of interest there, sir, among other
16      things. They're arguing with the placement of
17      that sign.
18          For God's sake, if they don't know where
19      the sign belong, if they don't know, who
20      does? If they know where the sign belong,
21      they should have put it there. They should
22      have put it there. It was never an issue that
23      that sign was incorrectly placed. I took that

Deposition of Alonzo Austin                                                    March 28, 2008

Page 85

1    sign to mean it to be truthful. And if
2    Tuskegee is saying that that's not honest and
3    that where that sign is, it's there for
4    ulterior purposes --
5            (Brief interruption.)
6    A.   If that sign is there for ulterior purposes
7         other than what it's designed to be there for,
8         then we as citizens, not just Tuskegee, the
9         state of Alabama is derelict, because we need
10        to straighten that out, sir. You may not
11        drive into Tuskegee, but other people do.
12        That's not fair to them.
13            We want -- we need -- We need people to
14        come to our city. We sure don't need the
15        police department out there doing stuff that's
16        going to deter this. That just makes no sense
17        to me. This is a classic illustration as far
18        as I'm concerned of the tail wagging the dog.
19            But I'm not so sure if the state of
20        Alabama is aware of Tuskegee's position. My
21        only concern has to do with where that line
22        crosses State Highway 81. And when the state
23        director and the state engineer placed that 55

Page 86

1    mile-an-hour sign up, they have the power to
2    do that. And I don't think they're going to
3    place it anywhere where it doesn't belong.
4            And there's very little the city can do
5    because they all coalesce. They have an
6    agreement. They have an understanding, and
7    the state rules. This is Alabama. Man,
8    Tuskegee is just a small municipality in the
9    scheme of things. They're just a small
10   municipality in the county of Macon.
11           This is a simple, simple case, and it
12   involves a stop outside of a sign. And jurors
13   can be brought there to visualize. I don't
14   need to take any pictures. Why spend money
15   like that for? They can see it for
16   themselves.
17   Q.  Mr. Austin, what is your -- where do you claim
18       the Tuskegee municipal corporate limits were
19       on Alabama Highway 81 on July 5, 2007, at
20       8:40 a.m.?
21   A.  Right where the sign was.
22   Q.  Okay. If the Tuskegee corporate municipal
23       limits were north on Alabama Highway 81 --

Page 87

1    were north of I-85, then you were within the
2    Tuskegee municipal corporate limits when you
3    were stopped by Officer Dawson, weren't you?
4    A.   You said if. You said if, Counselor. We're
5         only interested in the facts here. If it's
6         proven at that time that the municipal
7         corporate city limits was north of 85 crossing
8         81 north, then Tuskegee is in a heap big
9         trouble because the only thing that we can
10        rely on is where the sign was placed at the
11        time.
12            MR. DUKES: Let's take a break for
13            five minutes.
14            (Brief recess was taken.)
15            MR. DUKES: Back on the record.
16            (Defendant's Exhibit 1 was marked for
17            identification.)
18   Q.   Mr. Austin, I want to show you what is marked
19        Defendant's Exhibit 1 for purposes of this
20        deposition and was previously marked as
21        Exhibit 4 to the defendant's motion for
22        summary judgment. Have you seen that document
23        before?

Page 88

1    A.   I believe this is the copy that I received.
2         It appears to be the copy I received. I don't
3         have my motion before me. I know I've seen
4         some of it, not all of it.
5    Q.   On the front of that, it's labeled Act
6         2004-248; is that correct?
7    A.   Yes, sir.
8    Q.   If you flip over to page four, it's signed by
9         the Speaker of the House of Representatives;
10        is that correct?
11   A.   Page four? It's upside down. I can't figure
12        this one out. Okay. Speaker of the House.
13        Okay. I see Lucy Baxley.
14   Q.   Looking above that is the Speaker of the
15        House. The President and the Presiding
16        Officer of the Senate signed it as well, Lucy
17        Baxley; is that correct?
18   A.   I see Lucy Baxley's signature.
19   Q.   At the bottom, there's a little block that
20        says approved 4-19-04, and it's signed by
21        Governor Bob Riley.
22   A.   I see that, yes, sir. I think this is the one
23        that was submitted to me.

22 (Pages 85 to 88)

Page 89

1  Q.  And if you look at the bottom of page three
2      where it says Section 3:  This act shall
3      become effective on the first day of the third
4      month following its passage and approval by
5      the governor, or its otherwise becoming law.
6      Is that correct?
7  A.  Section 3:  This act shall become effective on
8      the first day of the third month following its
9      passage and approval by the governor, or its
10     otherwise becoming law.  Okay.
11 Q.  So the first day of the third month -- and it
12     was signed by the governor in April.  The
13     first month then would be May, the second
14     month would be June, and the first day of the
15     third month should be July 1st of 2004,
16     correct?
17 A.  If I follow you, that sounds correct.
18 Q.  Based on its face, Act 2004-248 became
19     effective on July 1st of 2004, correct?
20 A.  Based on its face.  Received April 14, 2004,
21     governor's office.  Hard for me to understand
22     this to be honest about it, Counselor.  I
23     can't make heads or tails out of this.

Page 90

1      But I can say this.  I don't -- The
2      acquisition of land, as I've indicated, in
3      this act -- I'm not disputing this act.  I've
4      never said that the act didn't exist.  The
5      only thing that I'm here for is the stop that
6      was made outside the city limits, the sign
7      that was placed at the time.  That's the only
8      reason I'm here.  Other than that --
9  Q.  Well --
10 A.  I'm not disputing the act.  I've not read it
11     all.  I don't know what -- Like I said, I hope
12     this is true and this would be beautiful if it
13     was.  I have no problem with the act.  I don't
14     understand why this was even brought into the
15     equation because it's clearly irrelevant.
16     I've never argued about whether or not an act
17     existed.  I've never said -- This has nothing
18     to do with the act.
19 Q.  Do you dispute, Mr. Austin, that this act
20     extends the municipal limits of the city of
21     Tuskegee to include the right-of-way of State
22     Route 81 from the then existing Tuskegee city
23     limits to the northern edge of a bridge north

Page 91

1      of the parcels that were incorporated here?
2  A.  I would need more factual development.  I
3      can't right now say if that's -- if that's --
4      if that relates to the corporate lines as it
5      crosses the state highway.  See, that's the
6      only problem I have.  Other than that, you
7      know, I can't -- I can't dispute that act and
8      what it entails.
9          Tuskegee is entitled to right-of-ways.
10     They can get them everywhere they want, you
11     know.  They have a right-of-way past my
12     house.  I'm so used to that.  We're
13     approximately three miles from the city
14     limits.  But back in '74, they extended the
15     Tuskegee jurisdiction for gas pipeline
16     purposes all the way past my house, all the
17     way up 199 across to I believe it's County
18     Road 56, and they had jurisdiction all the way
19     up there.
20         But where the line crosses the state
21     highway, it was 55.  That highway was 55 miles
22     an hour all the way up.  But they had,
23     apparently, concurrent jurisdiction, but they

Page 92

1      didn't have -- I mean, they could go up there
2      at the right-of-way, but they could not write
3      tickets outside of the city limits.
4          And I think this is probably where the
5      city and I -- I know this is where the city
6      and I part.  I trust that the city and I trust
7      that the city today is going to acknowledge
8      that wherever that city limit sign is placed,
9      that that is the corporate city limits.  Other
10     than that, it's a misrepresentation.
11         And then for them to come and bring this
12     in is like grasping straws.  What is your
13     defense?  If you don't have a defense, say I
14     don't have a defense, you know, and let's work
15     this out.  But for God's sake, I can only
16     rely -- and I made the point earlier.
17     Sterling Bank, Synovus.  Oh, do they?  Oh, let
18     me pull in there.  Now, if that says Sterling
19     Bank and Synovus and I drive up in there and
20     say, oh, man, the people are just fooling you,
21     it's April Fool; that's a chicken place up in
22     there.  All right.  Then I take off and I go
23     up here and I'm looking for a car and I have

Page 93

1    the same scenario and the sign says car place
2    and I drive up in there and it turns out to be
3    a juke joint --
4         Sir, that's not the way we do it here.
5    That's not the way we do it. So I can only
6    rely -- I'm not even arguing with where the
7    city limit sign was placed. As a matter of
8    fact, I agreed with it. I had no basis not to
9    because the state and the city get together
10   and place those signs, and it's up to me to
11   obey that.
12   Q. Mr. Austin, you have not answered my
13       question. I would appreciate it if you would
14       just answer my question instead of giving me a
15       ten-minute dissertation on what you believe
16       the law should be.
17   A. I've never said what the law should be. I'm
18       saying the city limit sign, Counselor, is the
19       only thing I used at the time. I was not
20       aware of this when I was stopped. No, I was
21       not.
22   Q. Do you dispute that the -- Where do you say
23       the Tuskegee municipal limits were on Alabama

Page 94

1    Highway 81 on July 5 of 2007?
2    A. Right where the sign was.
3    Q. Are you saying that the sign -- the placement
4       of the sign wherever it was trumps or is more
5       important or overcomes the act of the
6       legislature of the state of Alabama signed
7       into law by the governor that extended the
8       municipal limits north of I-85 on Alabama
9       Highway 81?
10   A. Counselor, I'm merely stating -- you asked the
11       question where did I think the sign -- where
12       did I think the limits were. I said the
13       limits were where the sign was placed. I
14       didn't add any additional verbiage to that.
15       And my position is as a citizen, I rely
16       on the sign. That's all I can do, you know.
17       I don't know anything about the other side
18       issues that are non-issues in this case. I'm
19       only concerned with the ticket that was
20       written and where the city -- in proximity to
21       where the city limit sign was and where
22       Officer Dawson was parked at the time.
23   Q. Mr. Austin, the location of the city limit

Page 95

1    sign does not determine where the city limits
2    are. The location of the city limits is
3    established by law. Act 2004-248 of the
4    Alabama legislature extended the city limits
5    of the city of Tuskegee to a point north of
6    I-85 to include that stretch of the
7    right-of-way of Alabama Highway 81. Do you
8    dispute that?
9    A. Again, I need more factual development. You
10       are representing the defendants.
11   Q. Mr. Austin, my question is, do you dispute
12       that Act Number 2004-248 of the Alabama
13       legislature extended the city limits of
14       Tuskegee --
15   A. I don't know, Counselor.
16   Q. -- to a point -- let me finish my question --
17       to a point north of I-85 to include that
18       stretch of right-of-way of Alabama Highway 81?
19   A. I don't know. I don't have enough factual
20       information, so I'm not -- I'm not in a
21       position to say. But, now, what you passed me
22       I'm not in argument with. I can agree with
23       that.

Page 96

1    Q. What factual information/development do you
2       need to be able to read the law and tell me
3       what the law says?
4    A. Counselor, I'm not saying what the law is.
5    Q. I'm asking you a question. I'm asking you a
6       question. What factual information do you
7       need to be able to tell me whether that act of
8       the Alabama legislature includes the
9       right-of-way of Alabama Highway 81 up to a
10       point north of I-85?
11   A. I'm not disputing this.
12   Q. Thank you.
13   A. I just don't know anything about it.
14   Q. What policy, practice, and custom is there of
15       the city of Tuskegee to operate a speed trap
16       outside of the city limits on Alabama Highway
17       81 north?
18   A. Well, I think you just cited that when you
19       indicated that they have right-of-way and
20       jurisdiction up to the interstate when, in
21       fact, the city limit sign is what I was using
22       and I still use it. So they were outside the
23       city limit -- corporate city limit sign.

Page 97

1  Q. Mr. Austin, the city limit sign doesn't set a
2     speed limit. How did they have a policy,
3     practice, custom, and usage of operating a
4     speed trap?
5  A. Counselor, I disagree with you there
6     respectfully. The city limit signs are
7     usually 45 miles an hour, especially in
8     Tuskegee. And outside of the city limits,
9     it's 55.
10       But, now, I agree with you the state law
11    sets the speed limit. But inside the
12    corporate limits, the speed limit is 45. Now,
13    once you go outside the corporate limits in
14    Macon County in Tuskegee, then you see the 55
15    mile-an-hour sign. I agree with you as far as
16    the law. The state sets the law.
17  Q. What practice -- what practice -- let me
18    rephrase this. What policy did the city of
19    Tuskegee have that related to operating a
20    speed trap as you alleged on Alabama Highway
21    81 North? What specific policy did they have?
22  A. According to Officer Dawson, she was
23    instructed to shoot radar where she was, and

Page 98

1     where Officer Dawson was was outside of the
2     corporate city limit sign. And Officer Dawson
3     indicated that she was told to do that, so she
4     wasn't doing this on her own.
5        So that would be the practice and the
6     policy to operate and shoot radar back into
7     the city outside of the city limits in
8     violation of the state law.
9  Q. Well, Mr. Austin, you just got through saying
10    you didn't dispute that the city limits of
11    Tuskegee included that section of 81 at the
12    time that you were stopped. So how was
13    that --
14  A. That's not exactly what I said. My position
15    has always been -- and I'll say it more than
16    once. I'm only concerned with the line, the
17    border as it crosses the state highway. Now,
18    beyond that, property on both sides could very
19    easily be incorporated by the city. I'm only
20    concerned with the border and where the city
21    limit sign is placed.
22       So therefore, based on what -- the
23    question you raised to me, Counselor, was with

Page 99

1     respect to this act. So I couldn't -- you
2     know, I can't really dispute if that act
3     transpired without more factual development
4     and whether or not those particular parcels of
5     land that are written on here were actually
6     incorporated in the city limits.
7        I'm assuming that they were based on this
8     document, but I'm not interested in parcels of
9     land and right-of-ways along state highway.
10    I'm only interested in for ticket writing
11    purposes, where does the corporate city
12    limit -- municipal corporate city limits end?
13    And the only way that I could determine that
14    was where the city limit sign was placed.
15       And where the city limit sign was
16    placed -- inside of the city limits, the sign
17    reads 45 miles an hour; once you exit the city
18    limits, 55. That's the only thing that I can
19    go by. Now, again, what the act did and
20    whether or not it incorporated other parcels
21    of land, I can't dispute that.
22  Q. Mr. Austin, I understand that you're not a
23    lawyer and that you haven't been to law

Page 100

1     school, but you are representing yourself in
2     this action; is that correct?
3  A. That's correct.
4  Q. And to represent yourself in this action, you
5     have to have certain knowledge of basic
6     concepts of law; is that correct?
7  A. Well, I don't know if that's necessary. You
8     can go to small claims court and not have any.
9  Q. Are you aware, Mr. Austin, that the
10    right-of-way of a highway includes the highway
11    itself?
12  A. It depends. I don't follow you, Counselor.
13  Q. Do you not understand that this act that
14    incorporated the right-of-way of Alabama
15    Highway 81 into the Tuskegee municipal limits
16    to a point north of I-85 included the highway
17    itself?
18  A. The right-of-way to the highway? According to
19    that document, it does.
20  Q. Okay.
21  A. That's what it says. But, again, I'm
22    concerned with where the city limit sign is on
23    the highway. That's the only thing I read.

Page 101

1    And we were outside of that city limit sign.
2    Anything else is irrelevant.
3  Q.  Mr. Austin, did you anywhere in your complaint
4    state that you detrimentally relied on the
5    location of the city limit sign?
6  A.  I did not, and there was a reason for it,
7    Counselor. At the time, they had not raised
8    this issue here, because it shows where my
9    thinking was at the time. I relied on the
10   city limit sign. I wasn't expecting this to
11   come up which is a side issue, again. And as
12   I've indicated, you know, the fact that
13   they've purchased other parcels of property,
14   I'm happy about that.
15       But at the time, I was only concerned --
16   and I'm only concerned now -- not with this,
17   not with that, because I don't know anything
18   about it. But I'm concerned with the stop
19   that was made, where it was located in
20   conjunction with the city limit sign.
21  Q.  Mr. Austin, let's just cut to the chase and
22   let's quit talking about the city limit sign
23   for a minute. 2004-248 of the state of

Page 102

1    Alabama says that that stretch of Alabama
2    Highway 81 where you were stopped was in the
3    municipal limits of the city of Tuskegee on
4    July 5, 2007, correct?
5  A.  Where is that at?
6  Q.  We just got through reading it, Mr. Austin.
7  A.  No, I didn't see that.
8  Q.  Do you say it does not say that?
9  A.  No, I'm saying I didn't see it. Where is it?
10  Q.  Are you saying that Act 2000 --
11  A.  No, I'm --
12  Q.  Hold on, Mr. Austin. Are you saying that Act
13   2004-248 of the Alabama Legislature signed
14   into law by the governor did not include that
15   section of Alabama Highway 81 where you were
16   stopped on January -- excuse me, July 5, 2007,
17   within the Tuskegee municipal limits?
18  A.  May I?
19  Q.  Certainly.
20  A.  Where is it? Point it out to me, Counselor,
21   because I looked at it. I didn't read it.
22  Q.  Mr. Austin, it's the law that --
23  A.  I'm saying, where is that section at?

Page 103

1  Q.  Mr. Austin, it's the law that covers the city
2    limits of the city of Tuskegee, and you're
3    arguing with me about where those city limits
4    are or should be.
5  A.  No, sir.
6  Q.  And now you're telling me that you haven't
7    read the law or don't understand the law that
8    sets those city limits?
9  A.  With all due respect, I'm not arguing that
10   point with you.
11  Q.  Mr. Austin --
12  A.  I'm talking about the city limit sign.
13  Q.  That's the whole point about why we're here,
14   is where the city limits were. Your argument,
15   your complaint says that you were stopped
16   outside the city limits.
17  A.  I did.
18  Q.  Your complaint doesn't say that you
19   detrimentally relied on the city limit sign.
20   It doesn't say that the city limits were
21   determined by the city limit sign. You're
22   trying to change your whole argument and your
23   whole complaint and you want to quibble with

Page 104

1    me here about stuff that is totally irrelevant
2    that you keep bringing up.
3        This act sets where the city limits are,
4    and you want to say you've got to have factual
5    information in addition to it to tell what it
6    says. Well, tell me where the city limits
7    were on July 5, 2007.
8  A.  Right where the sign was.
9  Q.  What is your legal basis for saying that?
10   Cite me a section of the Alabama Code that
11   says that the city limit sign determines where
12   the city limits actually are and that it
13   overrules the act of the Alabama Legislature.
14   Tell me where that is.
15  A.  I don't have that law in front of me, but I
16   can say what I relied on.
17  Q.  Well, tell me --
18  A.  I relied on --
19  Q.  Tell me where the law is that you relied on.
20  A.  I'll have to look it up, sir, but I can say
21   this. The law has stated that absent of a
22   sign --
23  Q.  Where in the law does it say that? Tell me

Page 105

1    where in the Code of Alabama it says that.
2    A.  I'll have to find it.
3    Q.  Have you ever read that in the Code of
4       Alabama?
5    A.  I have.  Absent a sign --
6    Q.  What title of the Code of Alabama is that
7       found in?
8    A.  I'll have to find it, sir.
9    Q.  As we sit here today, you don't know of that
10      law, do you?
11   A.  I know the law exists.  I read it.  I don't
12      have it handy.  I'm saying I can't read it to
13      you.  I can't present it, but I can -- I'll be
14      glad to present the document to you, sir.
15   Q.  Did you cite it in your complaint?
16   A.  I did not because at the time, I didn't feel I
17      needed to because this was about the city
18      limit.  It wasn't about anything else.
19          And I want to make sure that we
20      understand this.  I'm only concerned with the
21      city limit sign in conjunction with where the
22      stop was.  Now, beyond that, I can't argue one
23      way or the other.

Page 106

1    Q.  Well, see, Mr. Austin, we've already
2       established by the act of the legislature that
3       the city limits extended beyond that point.
4       Then you want to argue the sign.  Then when I
5       talk about the sign, you want to argue about
6       where the city limits were.  Now, you can't
7       have it both ways.
8    A.  The city limits is still where they were
9       then.  They haven't changed.
10   Q.  You're saying the city limits are where?
11   A.  Right where the sign is, indicative of the
12      sign.
13   Q.  Are you saying that the Tuskegee defendants
14      stopped you because you were black?
15   A.  What I was saying is, they stopped me.  And as
16      a result of that stop, I am special from the
17      standpoint of a citizen of the United States
18      because I'm African-American and I'm
19      protected.  I have certain rights under that
20      14th Amendment.
21   Q.  You have rights that other citizens don't
22      have?
23   A.  We have -- We have some protected rights as a

Page 107

1    result that a number of citizens don't have.
2    Q.  What rights do you have that other citizens
3       don't have?
4    A.  Well, the right not to be discriminated
5       against.
6    Q.  So other citizens can be discriminated
7       against?
8    A.  The right not to be discriminated against
9       because of your ethnicity is the point that I
10      was making.
11   Q.  So the special right that you have as an
12      African-American is not to be discriminated
13      against because of your ethnicity, but those
14      of other ethnicities don't have a similar
15      right?
16   A.  A lot of them do, sir.
17   Q.  What ethnic group does not have the right not
18      to be discriminated against because of their
19      ethnicity?
20   A.  I wouldn't -- I wouldn't know.
21   Q.  What of your rights were violated because you
22      were an African-American?
23   A.  Well, the idea is -- again, more factual

Page 108

1    development is necessary in this instance
2    because I've not had extensive -- I've not had
3    any extensive discovery of the defendants.  So
4    the question that you asked me I can't answer
5    it because I don't have any documentation from
6    the other side.
7    Q.  You made the complaint.  You made an
8       allegation.  You had to have some facts to
9       base that on, didn't you?
10   A.  Yes, sir, the law.
11   Q.  Well, how were you discriminated against on
12      the basis of your being an African-American by
13      Officer Dawson?
14   A.  We would have to, again, factually develop
15      that at some point in time.
16   Q.  You filed the complaint.  You said you had
17      some facts and a basis for doing that at the
18      time you filed the complaint.  How did Officer
19      Dawson --
20          She's a black female, correct?
21   A.  Yes, sir.
22   Q.  How did she discriminate against you on the
23      basis that you're an African-American?

Page 109

1    A.  Well, I never said that she did.
2    Q.  Okay.  How did Chief Patrick, who's an
3        African-American man --
4    A.  I didn't say he did.
5    Q.  Judge Bulls is an African-American man, isn't
6        he?
7    A.  Yes, sir.
8    Q.  How did Judge Bulls discriminate against you
9        on the basis that you're an African-American
10        man?
11    A.  I didn't say that either.
12    Q.  How did Mr. Thomas, the city prosecutor --
13        He's an African-American man, isn't he?
14    A.  No, I think he's Caucasian.
15    Q.  Are you sure?
16    A.  I said I think he's Caucasian.
17    Q.  But you're not sure?
18    A.  Again, this is -- you would have to -- I don't
19        have enough factual development to say if, in
20        fact, he is.
21    Q.  Let me ask you this, Mr. Austin.  How did
22        Mr. Thomas discriminate against you or violate
23        your rights based on the fact that you're an

Page 110

1        African-American man?
2    A.  Again, Counselor, I would need to develop that
3        in terms of what they did in comparison to
4        what they've done against other ethnic
5        groups.  I don't have that information --
6    Q.  Mayor Ford is an African-American man, isn't
7        he?
8    A.  Yes, I think.
9    Q.  How did Mayor Ford discriminate against you on
10        the basis that you're an African-American man?
11    A.  Again, I would have to say the same thing.  It
12        would be based on whether or not anybody else,
13        for example, had received a ticket driving the
14        maximum speed limit in the state of Alabama
15        and fined as a result of it.  So if that -- if
16        I'm the only one, then I could then proceed on
17        those bases.
18    Q.  Do you know of any white men that have been
19        driving through there that have been exceeding
20        the speed limit and were let go by any of
21        these people?
22    A.  I was not -- First of all, let's correct the
23        record.  The plaintiff was not exceeding the

Page 111

1        speed limit.  The record reflects that I was
2        driving the maximum speed limit, Counselor.
3    Q.  No, Mr. Austin, the record reflects based on
4        your sworn testimony that you didn't know how
5        fast you were going.
6    A.  I'm saying, but the judge stated that I was
7        driving 55 miles an hour, and that's what he
8        charged me with.  And so I paid a ticket
9        because I was driving 55 miles an hour in a 55
10        mile-an-hour zone.
11    Q.  Mr. Austin, Judge Bulls found you guilty of
12        driving 55 miles an hour in a 45 mile-per-hour
13        zone.
14    A.  That's what the ticket states, yes, sir.
15    Q.  Well, Mr. Austin, you can't pick and choose
16        your facts based on the judgment that Judge
17        Bulls entered.  He said that you were doing 55
18        in a 45 zone, correct?
19    A.  That's what it says.
20    Q.  Thank you.
21    A.  But the law states otherwise.
22    Q.  What law states otherwise?
23    A.  The speed limit sign that says 55.

Page 112

1    Q.  Judge Bulls found that it said 45, didn't he?
2    A.  That's what Judge Bulls found.  That's what
3        I'm disputing.  That's why I sued the judge.
4    Q.  If you disputed that, Mr. Austin, why didn't
5        you appeal your conviction to the Circuit
6        Court of Macon County which you're entitled to
7        do under Alabama law?
8    A.  I used the other option.
9    Q.  What option is that?
10    A.  To file a suit here.
11    Q.  If you wanted your conviction set aside, the
12        only way to do that would have been to have
13        appealed it to the Circuit Court of Macon
14        County, correct?
15    A.  No, sir, that's not the only way.  I can have
16        it done here.
17    Q.  Mr. Austin, what malice did Officer Dawson
18        have toward you?
19    A.  Well, actually, by citing me -- first of all,
20        by stopping me, claiming that the speed limit
21        was 45 when, in fact, it was 55.
22        And then, of course, with her drawing up
23        this ticket and swearing that the speed limit

Page 113

1   was 45 outside of the municipal city limits
2   when, in fact, the law says it's 55, and then
3   not even bothering to cite -- not even
4   bothering to cite the subparagraph to the
5   specific -- as a matter of fact, she still
6   hasn't done that. And now she acknowledges
7   the speed to be 55 in her affidavit.
8       Had she accepted my 55 mile-an-hour
9   travel at the time and offered to -- Judge
10  Bulls found me driving at 55 miles an hour,
11  you know, the case would have been dismissed
12  and I would have went home. There wouldn't be
13  a suit here.
14  Q.  Where in her affidavit does Officer Dawson say
15      that the speed limit was 55 at the time that
16      she stopped you?
17  A.  She didn't say it was 55 at the time. She
18      said it was 45. That's my point I'm making.
19      She claimed it was 45 then, and she and I
20      disputed that. I mean, we had a dispute.
21      That's another reason why I'm there. But,
22      now, she later recanted and said it's now 55
23      in her affidavit. But at the time, she

Page 114

1   claimed it was 45. Her sworn statement, she
2   wore it was 45, and I was convicted as a
3   result of that.
4   Q.  Yes, sir. You were convicted of the speed
5       limit as it was on the date of your offense,
6       not on the date the speed limit changed at any
7       subsequent time.
8   A.  That's still a dispute between the defendants
9       and the plaintiff.
10  Q.  Well, as a legal matter, it's not because
11      you've been convicted. You chose not to
12      appeal it, and that conviction stands.
13  A.  That is incorrect, Counselor.
14  Q.  Well, what is your basis for stating that you
15      have the constitutional right to a trial by
16      jury on a speeding violation?
17  A.  I can get that to you. It's on the back of
18      the ticket. I just have the front side here.
19  Q.  Where on the ticket does it say you're
20      entitled to a jury trial?
21  A.  It's on the back side. It talks about jury
22      trials on the back side of the ticket, you
23      know. Do you have the original or a copy of

Page 115

1   both sides? I just have the front. I'll be
2   glad to get it for you. I have it at the
3   house, the original at the house.
4       But just to clarify something,
5   Counselor. I wasn't asking for a jury trial
6   in the municipal court because I know they
7   don't give them, see. That was an
8   alternative. Providing Officer Bulls -- Judge
9   Bulls decided to dismiss it on jurisdictional
10  grounds, then the city then could go to the
11  circuit court and then ask that I be tried on
12  the same charge. That's where my jury -- I
13  would have been asking for a jury pursuant to
14  Alabama Rules of Civil Procedure 38.
15      I'm well aware that Officer Bulls -- I
16  mean Judge Bulls don't offer jury trials. I'm
17  well aware of that. I wasn't asking that. I
18  asked for the motion to dismiss on
19  jurisdictional grounds as the ticket happened
20  outside the city.
21  Q.  Well, Judge Bulls found that it occurred
22      inside the city limits; is that correct?
23  A.  I don't have anything from Judge Bulls to say

Page 116

1   that. What Judge Bulls did tell me, he said,
2   Mr. Austin, I find that you were driving 55
3   miles an hour in a 45 mile-an-hour zone. And
4   let me see if I can find that.
5       Do you have a copy of that? Do you have
6   a copy of it, Counselor? If not, I think --
7   I'm sure I've got that. Here it is. That's
8   all I have.
9   Q.  You were found guilty of 55 in a 45 zone,
10      correct?
11  A.  That's what Judge Bulls said, and that's what
12      prompted the suit. That gave rise to the suit
13      because I disagree with that. It's my
14      contention I was driving 55 miles an hour --
15      I'm sorry. The speed limit where I was, was
16      55 miles an hour. That's my contention.
17  Q.  Do you have any documents that support your
18      claim that there was a policy or scheme or
19      plan by the city of Tuskegee to intentionally
20      entrap people for speeding in the area where
21      you were cited?
22  A.  I don't have because I've not been able to get
23      any discovery. As you know, my discovery was

Page 117

1    denied for being untimely filed, so I don't
2    have any documentation. However, I'll look to
3    other avenues for more factual development,
4    and at that time I can better answer that
5    question.
6  Q.  Where does your wife work?
7  A.  Magnolia Haven Nursing Home.
8  Q.  What does she do there?
9  A.  Dietary manager.
10 Q.  When did you first learn of your contention
11   that the speed limit -- Strike that question.
12      Mr. Austin, what do you claim that Mayor
13   Ford did wrong in this case?
14 A.  Conspired, sir.
15 Q.  Who did he conspire with?
16 A.  Well, the names are down here.  Albert C.
17   Bulls III, which is the judge, Chief Patrick,
18   Prosecutor Keith Thomas, Bernice Dawson, City
19   of Tuskegee.
20 Q.  When did he conspire with them?
21 A.  During the time that this was going on.
22 Q.  What did he conspire with them to do that you
23   contend was wrong?

Page 118

1  A.  45 mile-an-hour in a 55 mile-an-hour zone.
2  Q.  I'm sorry.  Explain that for me.
3  A.  Well, real simple.  They're outside the city
4    limits shooting radar back in, and they're
5    grabbing -- at least they grabbed me and
6    claimed the speed limit was 45 when, in
7    fact, it was 55 miles an hour.
8       Now, I know especially Mayor Ford, he's
9    out there all the time.  They know better.  As
10   indicated by Chief Patrick I know of, Bernice
11   Dawson I know of -- they've got 20, 20 plus
12   years experience out there.  They knew exactly
13   what they're doing.
14      But I will say this in their defense.
15   Since that happened, I've not seen them out
16   there, so I give them that much credit.
17   People have been looking.  People have been
18   spotting and they've been telling me I don't
19   see them out there no more.  And I said to
20   them I'm glad, because they shouldn't have
21   been out there in the first place.  So that's
22   a good thing.
23 Q.  Do you contend that the City of Tuskegee is no

Page 119

1    longer enforcing traffic laws between Moton
2    Field and I-85 on Alabama Highway 81 since
3    your traffic stop?
4  A.  I'm contending that I have not seen the City
5    of Tuskegee out there issuing tickets.  I
6    don't know about the rest.  I've not seen them
7    issuing tickets.  And, Counselor, for all
8    intents and purposes, to be fair about it,
9    this is just about issuing tickets, nothing
10   else.
11      Like I said, I love Tuskegee.  I respect
12   the police force.  I just wish they would
13   respect us.  When I include us, I include you
14   by the way.
15 Q.  Well, you're not there 24 hours a day seven
16   days a week to see whether or not they're
17   writing tickets on that stretch of highway,
18   are you?
19 A.  I'm not there, no, sir.  But I have not seen
20   them writing a ticket on that stretch of
21   highway since they issued a ticket to me.  And
22   I have not even seen the vehicles out there
23   stopped at the end.  However, I have seen them

Page 120

1    traveling maybe up the road, but I've not seen
2    them out there even parked at the end, which
3    is a good thing.  I emphasize that.  That's a
4    good thing.  And I support the Tuskegee PD.  I
5    support them issuing tickets within their
6    corporate city limits at 45 miles an hour.
7       Now, I'll tell you where I have seen
8    her.  I've seen her.  My wife drives that road
9    every day -- at least five days a week, and we
10   normally see her in the park -- the industrial
11   park which is inside the municipal corporate
12   city limits right there just before you get to
13   199 and 81 -- on 81 before you intersect
14   there, just south of there where the old
15   Wilson store used to be.  We see her parked
16   there.  Rightfully so.  We applaud them for
17   doing it.  That's where she should have been
18   parked that morning.  That's the only --
19   That's my position.
20      I'm not fighting the city like that.  I
21   appreciate the city.  I grew up there.  I
22   raised three daughters there, sir.  We love
23   the town, but we certainly would like for it

Page 121

1      to be fair. And when you and other people
2      come in to visit, we want to make sure that
3      they're treated -- that the department treats
4      you fair so you'll come back. It's not really
5      about me.
6  Q.  Well, Mr. Austin, let me ask you this.
7      Officer Dawson has given a sworn affidavit
8      that at the time of your traffic stop, the
9      speed limit where you were stopped was 45
10     miles an hour.
11  A.  That's correct.
12  Q.  Chief Patrick has given a sworn affidavit
13     stating that where you were stopped, at the
14     time of the stop the speed limit was 45 miles
15     an hour; is that correct?
16  A.  You know what? You're asking --
17  Q.  Mr. Austin, is that correct?
18  A.  I can't recall. Let me see -- I don't have
19     that motion before me. I know he's given an
20     affidavit, and I don't know if he's cited the
21     speed limit. I know he cited his experience
22     and something else, but I can get that back to
23     you, sir. I don't have it. Do you have a

Page 122

1      copy of it? I'll be glad to look at it. If
2      that's so, I'll acknowledge it.
3          For the record, that's my dispute, that
4      it's 55 rather than 45. I mean, I can testify
5      to you that Judge Bulls already stated that,
6      so I'm in dispute with him. I'm in dispute
7      with all of them.
8  Q.  Do you recall seeing that before, an affidavit
9     of Chief Patrick?
10  A.  Right. I was trying to see where it says 45.
11     I don't remember seeing 45 on here. No, sir,
12     I don't see 45 on here.
13  Q.  Says the posted and legal speed limit where
14     Mr. Austin --
15  A.  Describe the ... Yeah, he did say that in July
16     2007.
17  Q.  July 2007. Chief Patrick has said that was
18     the speed limit.
19  A.  And Judge Bulls said it.
20  Q.  Judge Bulls said that.
21  A.  And that's why I'm down here.
22  Q.  Mr. Thomas, the prosecutor, maintained that
23     that was the speed limit there, too, when he

Page 123

1      prosecuted you there, is that correct?
2  A.  I'm assuming that's what he -- we don't have a
3     statement from him, so I can't --
4  Q.  You were prosecuted for doing 55 in a 45 zone,
5     correct?
6  A.  That's what Judge Bulls said. My contention
7     is that I was driving 55 -- I mean, my
8     contention is I don't know exactly how fast I
9     was driving, but Judge Bulls said that I was
10     driving 55 in a 45 mile-an-hour zone. I want
11     to make sure I'm clear on that.
12  Q.  Well, you were prosecuted for speeding --
13     exceeding the speed limit in a 45 mile-per-
14     hour zone; is that correct?
15  A.  That's the way they prosecuted me.
16  Q.  And that's how Mr. Thomas, the city
17     prosecutor, prosecuted the case, that you were
18     exceeding the speed limit in a 45 mile-per-
19     hour zone; is that correct?
20  A.  I would guess -- I would think so. But we
21     don't have a statement from him, so I can't
22     put words in his mouth, Counselor, but I would
23     assume that that -- you know, that would stand

Page 124

1      to reason that would be his position.
2  Q.  All these people contend that the speed limit
3     at the time was 45 except for you, correct?
4  A.  Yes, sir. That's why the lawsuit is here.
5  Q.  Do you have any evidence other than your
6     say-so that the speed limit on that stretch of
7     Alabama Highway 81 was not 45 miles per hour
8     on July 5, 2007?
9  A.  Do I have any evidence?
10  Q.  Yes, sir.
11  A.  I don't have any physical evidence, but the
12     signs up --
13  Q.  The sign is up now?
14  A.  What do you mean the sign is up now?
15  Q.  If it says 55 now, it doesn't mean that was
16     the same sign that was there then, correct?
17  A.  I don't know what you're referring to, sir.
18     The 45 mile-an-hour sign on this side of the
19     city limits, and then on the other side is 55.
20  Q.  Are you talking about where the city limit
21     sign is north of I-85?
22  A.  No, sir. There's a 55 mile-an-hour sign south
23     on 81 just outside -- it was just outside the

Deposition of Alonzo Austin                                                      March 28, 2008

Page 125

1    city limits. But when I drove by the other
2    day, it appears --
3    Q.  Mr. Austin, I'm sorry to interrupt you, but
4        we're getting into this circular argument
5        again. One minute you admit that the city
6        limits were extended north of I-85 on Alabama
7        Highway 81, and the next minute you're saying
8        it's back down where the old --
9    A.  No, sir.
10   Q.  -- where the old sign was.
11   A.  I've never said the city -- I don't know where
12       the city limits is except for where the city
13       limits sign is, and the city limit sign is
14       south of 85, almost back to 81. Now, that's
15       the only thing I have stated directly, sir. I
16       can't argue as to where the city limits is. I
17       can only argue with where the city limit sign
18       was.
19   Q.  Are you aware of any witnesses to the traffic
20       stop that Officer Dawson made on you on July 5
21       of 2007?
22   A.  No, other than Officer Dawson.
23   Q.  Do you have any evidence whatsoever other than

Page 126

1    your say-so that the speed limit on Alabama
2    Highway 81 where you were stopped on July 5,
3    2007, was not 45 miles per hour?
4    A.  Yes, sir, the sign. That's all I go by. I
5        only went by the sign. The sign said 55 miles
6        an hour.
7    Q.  Do you have a photograph from July 5, 2007,
8        showing --
9    A.  I don't have a photograph. Counselor, if you
10       want to drive up, it's there. You can look.
11   Q.  Do you have any evidence that the sign that's
12       there now that shows 55 miles per hour is the
13       same sign that was there on July 5, 2007?
14   A.  I can't say whether that's the same sign or
15       not. I can just say a 55 mile-an-hour sign is
16       up there now.
17          People come along and, you know, people
18       run into signs and knock them down. They do
19       all kinds -- especially in Tuskegee. Ain't no
20       telling how many signs may have been replaced
21       here and there. Drunks run across them, bend
22       them up, the state comes back and replaces
23       them. I can't say if it's the same identical

Page 127

1    sign, no, sir.
2    Q.  Do you have any documents, any audio
3        recordings, any video recordings, any other
4        type of physical evidence of a conspiracy or a
5        plan or a scheme or a practice by any of these
6        defendants to knowingly and intentionally
7        write speeding tickets for people who were
8        doing more than 45 miles per hour but less
9        than 55 miles per hour in the area where you
10       were stopped?
11   A.  I followed you up until a point. I was trying
12       to keep up with your eyes. If you don't mind
13       repeating it again. I'm trying to follow
14       you. It's almost like two or three -- I
15       almost feel you. Come again.
16   Q.  Mr. Austin, you're claiming that there was a
17       conspiracy, a plan, a scheme or some type of
18       practice by all these defendants that you've
19       named in the lawsuit to knowingly cite people
20       for speeding in the area where you were,
21       knowing that the -- with them knowing that the
22       speed limit was not 45 miles per hour and
23       knowing that the speed -- the city limits were

Page 128

1    not -- did not include that area. Do you have
2    any physical evidence whatsoever --
3    A.  Yes, sir.
4    Q.  -- of that?
5    A.  Yes, sir. You have it in your file.
6    Q.  What is that, Mr. Austin?
7    A.  The document.
8    Q.  What document, Mr. Austin?
9    A.  The very one -- the ticket complaint that she
10       filled out.
11   Q.  Your only evidence of this conspiracy was the
12       traffic ticket that was written by Officer
13       Dawson; is that correct?
14   A.  And in combination with Officer Dawson's
15       testimony in her affidavit and Officer
16       Dawson's testimony in the court that got me
17       convicted when she was shooting radar back
18       into the city. I know Officer Dawson doesn't
19       do that without her superiors being involved.
20       That's her testimony, not mine. That's what
21       got me convicted.
22          And if I may cite, Counselor, while
23       you're there, that ticket itself still doesn't

Page 129

1    tell us -- you, I, or anyone else -- whether
2    or not she was in the city or outside the city
3    because she didn't check it, and she purposely
4    omitted the subsection. To this day, I'm
5    looking for her subsection. Mine is nine.
6            MR. DUKES: Thank you, Mr. Austin.
7        I don't have any more questions.
8        THE WITNESS: Thank you, sir.
9        (Deposition concluded at 12:30 p.m.)
10
11
12
13
14
15        * * * * * * * * * * * *
16        FURTHER DEPONENT SAITH NOT
17        * * * * * * * * * * * *
18
19
20
21
22
23

Page 130

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J. Green, CCR, Registered
5    Professional Reporter, and Commissioner for the State
6    of Alabama at Large, do hereby certify that I reported
7    the deposition of:
8            ALONZO AUSTIN
9    who was first duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the matter
11   of:
12        ALONZO AUSTIN,
13        Plaintiff,
14        Vs.
15        CITY OF TUSKEGEE, et al.,
16        Defendants.
17        In The U.S. District Court
18        For the Middle District of Alabama
19        Northern Division
20        Case Number 3:07-cv-754-MHT
21   on Friday, March 28, 2008.
22        The foregoing 129 computer printed pages
23   contain a true and correct transcript of the

Page 131

1    examination of said witness by counsel for the parties
2    set out herein. The reading and signing of same is
3    hereby not waived.
4        I further certify that I am neither of kin
5    nor of counsel to the parties to said cause nor in any
6    manner interested in the results thereof.
7        This 8th day of April 2008.
8
9
10
        _____
        Lisa J. Green, ACCR #334
11      Expiration Date: 9-30-2008
        Registered Professional Reporter
12      and Commissioner for the State
        of Alabama at Large
13
14
15
16
17
18
19
20
21
22
23

Page 132

1
2
3        I, Alonzo Austin, hereby certify that I have
4    read the foregoing transcript of my deposition given
5    on Friday, March 28, 2008, and it is a true and
6    correct transcript of the testimony given by me at the
7    time and place stated with the corrections, if any,
8    and the reasons therefor noted on a separate sheet of
9    paper and attached hereto.
10
11
12
13      _____
        Alonzo Austin
14
15
16
17      SWORN TO AND SUBSCRIBED before me this
18      _____ day of _____, 20__.
19
20
21      _____
        NOTARY PUBLIC
22
23

Report Copy
Via Certified mail

132

1

2

3        I, Alonzo Austin, hereby certify that I have

4   read the foregoing transcript of my deposition given

5   on Friday, March 28, 2008, and it is a true and

6   correct transcript of the testimony given by me at the

7   time and place stated with the corrections, if any,

8   and the reasons therefor noted on a separate sheet of

9   paper and attached hereto.

10

11

12

13                    *Alonzo Austin pro se*

                        Alonzo Austin

14

15

16

17              SWORN TO AND SUBSCRIBED before me this

18   5TH day of MAY                , 2008.

19

20

21                    *Valerie A. Hall*

                      NOTARY PUBLIC

22

                      My Commission Expires January 25, 2012

23

PG: 1 OF 5

## *CORRECTION SHEET*

| **PAGE** | **LINE S** | **CORRECTIONS** |
|---|---|---|
| 1: | 14, 15 | Are incorrect. |
| 3: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Are incorrect |
| 4: | 1, 2,3,4,5,6,7,8,9,10,11,12,13,14,15, | Inadmissable |
| 4: | 16,17,18,19,20,21,22,23 | Inadmissable |
| 5: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23, | Inadmissable |
| 6: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23. | Inadmissable |
| 7: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 8: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 9: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 10: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 11: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 12: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 13: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 14: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 15: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 16: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 17: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 18: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 19: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23, | Inadmissable |
| 20: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 21: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 22: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 23: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 24: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |

Via Certified Mail

by Alonzo Austin

13/21 orion Curtis Rd.

Alonzo Austin (Witness)

Tadegee, Al, 36083

Ph# (334) 727-5476

PG- 2 of 5

## CORRECTION SHEET

| PAGE | LINES | CORRECTIONS |
|---|---|---|
| 25: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 26 | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 27: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 28: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 29: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 30: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 31: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 32: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 33: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 34: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 35: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 36: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 37: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 38: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 39: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 40: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 41: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 42: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 43: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 44: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 45: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 46: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 47: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 48: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 49, | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 50: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |

Alonzo Austin (Witness)
321 River Carlis Rd,
Tuskegee, Al. 36083
Ph# (334) 727-5476

PG. 3 of 5

## CORRECTION SHEET

| PAGE | LINES | CORRECTIONS |
|---|---|---|
| 51: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,23,23 | INadmissable |
| 52: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 53: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 54: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 55: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 56: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 57: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 58: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 59: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 60: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 61: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 62: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 63: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 64: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 65: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 66: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 67: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 68: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 69: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 70: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 71: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 72: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 73: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 74: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 75: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 76: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 77: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 78: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 79: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 80: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 81: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 82: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 83: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 84: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |
| 85: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | INadmissable |

by, Alonzo Austin pro se
Alonzo Austin (Witness)
1321 Oliver Carlis Rd
Tuskegee Al. 36083
Ph.# (334) 721-8479

*PG, 4 of 5*

# CORRECTION SHEET

| PAGE | LINES | CORRECTIONS |
|---|---|---|
| 86: | 1,2,3,4,5,6, 7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 87: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 88: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 89: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 90: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 91: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 92: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 93: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 94: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 95: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 96: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 97: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 98: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 99: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 100: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 101: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 102: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 103: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 104: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 105: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 106: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 107: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 108: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 109: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 110: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 111: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 112: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 113: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 114: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 115: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 116: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 117: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 118: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 119: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 120: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |

by, *Alonzo Austin* (Witness)
1321 Oliver - Carlis Rd.
Tuskegee AL. 36083
Ph# (334) 727-5476

PG. 5 OF 5

## CORRECTION SHEET

| **PAGE** | **LINES** | **CORRECTIONS** |
|---|---|---|
| 121: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,19,20,26,23 | Inadmissable |
| 122: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 123: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 124: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 125: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 126: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 127: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 128: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 129: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 130: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 131: | 1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |
| 132: | 1,2,3, | Inadmissable |
| 132: | 4 | Replaced the word given with the words objected too. |
| 132: | 5, | Inadmissable |
| 132: | 6, | Replaced the word given with the words objected too. |
| 132: | 7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,23 | Inadmissable |

By. Alonzo Austin Rios
ALONZO AUSTIN (Witness)
132 oliver-Carlis Rd.
Tuskegee, Al. 36083
Phn# (334) 727-5476

PG. 1 OF 6 (Via Certified mail)

| PAGE | LINES | REASONS FOR CORRECTIONS. |
|------|-------|--------------------------|
| 1: | 14 | Plaintiff, Alonzo Austin, Objection (doc.#44: |
| 1: | 15 | it's Motion For protective order doc.#45: |
|   |   | Filed on march 27, 2008) |
| 3: | 1 thru 23 | Plaintiff, Alonzo Austin, Objection (See above) |
| 4: | 1,2 | for the Same reasons given above. |
| 4: | 6 thru 23 | " " " " " " |
| 5: | 1 " 23 | " " " " " " |
| 6: | 1 " 23 | " " " " " " |
| 7: | 1 " 23 | " " " " " " |
| 8: | 1 " 23 | " " " " " " |
| 9: | 1 " 23 | " " " " " " |
| 10: | 1 " 23 | " " " " " " |
| 11: | 1 " 23 | " " " " " " |
| 12: | 1 " 23 | " " " " " " |
| 13: | 1 " 23 | " " " " " " |
| 14: | 1 " 23 | " " " " " " |
| 15: | 1 " 23 | " " " " " " |
| 16: | 1 " 23 | " " " " " " |
| 17: | 1 " 23 | " " " " " " |
| 18: | 1 " 23 | " " " " " " |
| 19: | 1 " 23 | " " " " " " |
| 20: | 1 " 23 | " " " " " " |
| 21: | 1 " 23 | " " " " " " |
| 22: | 1 " 23 | " " " " " " |
| 23: | 1 " 23 | " " " " " " |
| 24: | 1 " 23 | " " " " " " |

| PAGE | LINES | REASONS FOR CORRECTIONS (CONTINUED) |
|------|-------|-------------------------------------|
| 25: | 1 thru 23 | For the same reasons given above. |
| 26: | 1 thru 23 | " " " " " " |
| 27: | 1 thru 23 | " " " " " " |
| 28: | 1 " 23 | " " " " " " |
| 29: | 1 " 23 | " " " " " " |
| 30: | 1 " 23 | " " " " " " |
| 31: | 1 " 23 | " " " " " " |
| 32: | 1 " 23 | " " " " " " |
| 33: | 1 " 23 | " " " " " " |
| 34: | 1 " 23 | " " " " " " |
| 35: | 1 " 23 | " " " " " " |
| 36: | 1 " 23 | " " " " " " |
| 37: | 1 " 23 | " " " " " " |
| 38: | 1 " 23 | " " " " " " |
| 39: | 1 " 23 | " " " " " " |
| 40: | 1 " 23 | " " " " " " |
| 41: | 1 " 23 | " " " " " " |
| 42: | 1 " 23 | " " " " " " |
| 43: | 1 " 23 | " " " " " " |
| 44: | 1 " 23 | " " " " " " |
| 45: | 1 " 23 | " " " " " " |
| 46: | 1 " 23 | " " " " " " |
| 47: | 1 " 23 | " " " " " " |
| 48: | 1 " 23 | " " " " " " |
| 49: | 1 " 23 | " " " " " " |
| 50: | 1 " 23 | " " " " " " |

PG. # 3 OF 6

PAGES LINES REASONS FOR CORRECTION (CONTINUES)

| PAGES | LINES | REASONS FOR CORRECTION (CONTINUES) |
|-------|-------|-------------------------------------|
| 51: | 1 thru 23 | For the same reasons given above |
| 52: | 1 " 23 | " " " " " " |
| 53: | 1 " 23 | " " " " " " |
| 54: | 1 " 23 | " " " " " " |
| 55: | 1 " 23 | " " " " " " |
| 56: | 1 " 23 | " " " " " " |
| 57: | 1 " 23 | " " " " " " |
| 58: | 1 " 23 | " " " " " " |
| 59: | 1 " 23 | " " " " " " |
| 60: | 1 " 23 | " " " " " " |
| 61: | 1 " 23 | " " " " " " |
| 62: | 1 " 23 | " " " " " " |
| 63: | 1 " 23 | " " " " " " |
| 64: | 1 " 23 | " " " " " " |
| 65: | 1 " 23 | " " " " " " |
| 66: | 1 " 23 | " " " " " " |
| 67: | 1 " 23 | " " " " " " |
| 68: | 1 " 23 | " " " " " " |
| 69: | 1 " 23 | " " " " " " |
| 70: | 1 " 23 | " " " " " " |
| 71: | 1 " 23 | " " " " " " |
| 72: | 1 " 23 | " " " " " " |
| 73: | 1 " 23 | " " " " " " |
| 74: | 1 " 23 | " " " " " " |
| 75: | 1 " 23 | " " " " " " |
| 76: | 1 " 23 | " " " " " " |

PG.# 4 of 6

| PAGES | LINES | REASONS FOR CORRECTIONS (CONTINUES) |
|-------|-------|-------------------------------------|
| 77: | 1 thru 23 | for the same reasons given above. |
| 78: | 1 " 23 | " " " " " " |
| 79: | 1 " 23 | " " " " " " |
| 80: | 1 " 23 | " " " " " " |
| 81: | 1 " 23 | " " " " " " |
| 82: | 1 " 23 | " " " " " " |
| 82: | 1 " 23 | " " " " " " |
| 83: | 1 " 23 | " " " " " " |
| 84: | 1 " 23 | " " " " " " |
| 85: | 1 " 23 | " " " " " " |
| 86: | 1 " 23 | " " " " " " |
| 87: | 1 " 23 | " " " " " " |
| 88: | 1 " 23 | " " " " " " |
| 89: | 1 " 23 | " " " " " " |
| 90: | 1 " 23 | " " " " " " |
| 91: | 1 " 23 | " " " " " " |
| 92: | 1 " 23 | " " " " " " |
| 93: | 1 " 23 | " " " " " " |
| 94: | 1 " 23 | " " " " " " |
| 95: | 1 " 23 | " " " " " " |
| 96: | 1 " 23 | " " " " " " |
| 97: | 1 " 23 | " " " " " " |
| 98: | 1 " 23 | " " " " " " |
| 99: | 1 " 23 | " " " " " " |
| 100: | 1 " 23 | " " " " " " |
| 101: | 1 " 23 | " " " " " " |

PG.# 5 of 6

| PAGES | LINES | REASONS FOR CORRECTIONS (CONTINUES) |
|---|---|---|
| 102: | 1 thru 23 | For the same reasons given above |
| 103: | 1 thru. 23 | " " " " " " |
| 104: | 1 " 23 | " " " " " " |
| 105: | 1 " 23 | " " " " " " |
| 106: | 1 " 23 | " " " " " " |
| 107: | 1 " 23 | " " " " " " |
| 108: | 1 " 23 | " " " " " " |
| 109: | 1 " 23 | " " " " " " |
| 110: | 1 " 23 | " " " " " " |
| 111: | 1 " 23 | " " " " " " |
| 112: | 1 " 23 | " " " " " " |
| 113: | 1 " 23 | " " " " " " |
| 114: | 1 " 23 | " " " " " " |
| 115: | 1 " 23 | " " " " " " |
| 116: | 1 " 23 | " " " " " " |
| 117: | 1 " 23 | " " " " " " |
| 118: | 1 " 23 | " " " " " " |
| 119: | 1 " 23 | " " " " " " |
| 120: | 1 " 23 | " " " " " " |
| 121: | 1 " 23 | " " " " " " |
| 122: | 1 " 23 | " " " " " " |
| 123: | 1 " 23 | " " " " " " |
| 124: | 1 " 23 | " " " " " " |
| 125: | 1 " 23 | " " " " " " |
| 126: | 1 " 23 | " " " " " " |
| 127: | 1 " 23 | " " " " " " |

PG. 6 of 6

| PAGES | LINES | REASONS FOR CORRECTIONS (CONTINUES) |
|-------|-------|-------------------------------------|
| 128: | 1 thru 23 | For the same reasons given above |
| 129: | 1 " 23 | " " " " " " |
| 130: | 1 " 23 | " " " " " " |
| 131: | 1 " 23 | " " " " " " |
| 132: | 1 " 23 | " " " " " " |

by, Alonzo Austin Jose
ALONZO AUSTIN
1321 Oziver-Carlis Rd.
Tuskegee Al. 36083
Ph # (334) 727-5476
FAX # (334) 927-2159 ATTN: Yvonne